CARMAX AUTO SUPERSTORES CALIFORNIA LLC, a Virginia limited liability company, Plaintiff,

v.

Rosella Michelle HERNANDEZ, an individual, Defendant.

CASE NO. CV 14–08743 MMM (JEMx)

United States District Court, C.D. California.

Signed 04/30/2015

Jack S. Sholkoff, Patricia M. Jeng, Ogletree Deakins Nash Smoak and Stewart PC, Los Angeles, CA, for Plaintiff.

Ramin R. Younessi, Law Offices of Ramin R. Younessi, A.P.L.C., Los Angeles, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION TO COMPEL ARBITRATION

MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

On November 12, 2014, CarMax Auto Superstores California LLC ("CarMax") filed a petition for an order compelling arbitration under § 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4; it also sought a stay of state court proceedings arising out of its dispute with Rosella Michelle Hernandez.[1] Hernandez filed a motion to dismiss CarMax's petition for lack of subject matter jurisdiction on December

---

1. Petition for Order Compelling Arbitration and Stay of State Court Proceedings Pursuant to Federal Arbitration Act ("Petition"), Docket No. 1 (Nov. 12, 2014).

3, 2014,[2] and on December 30, 2014, Car-Max filed a motion to compel arbitration and stay the state court proceedings.[3] Both motions are opposed.[4]

## I. FACTUAL BACKGROUND

### A. Facts Alleged in the Petition

CarMax alleges that, beginning in 2002, it employed Hernandez as a Management Assistant.[5] It asserts that, at the time Hernandez applied for employment at Car-Max, she executed a Dispute Resolution Agreement ("DRA").[6] CarMax attaches a copy of the DRA executed by Hernandez to its petition.[7] The DRA states, in relevant part:

> "[B]oth CarMax and I agree to settle any and all previously unasserted claims, disputes, or controversies arising out or relating to my application or candidacy for employment, employment, and/or cessation of employment with CarMax, exclusively by final and binding arbitration before a neutral Arbitrator."[8]

The DRA requires the applicant to "file a claim for arbitration within one (1) year of the day on which [she] know[s] or, through reasonable diligence, should have known of the facts giving rise to [the] claim." It requires that the arbitration be conducted in accordance with CarMax's Dispute Resolution Rules and Procedures ("DRRP").[9]

Hernandez was purportedly given a copy of the DRRP before signing the DRA.[10] At the time she executed the DRA, the DRRP in effect was dated January 2001; since that time, CarMax has purportedly made various changes to the DRRP, most recently in 2011.[11] CarMax attaches copies of the 2001 and 2011 DRRPs to its petition.[12]

On September 25, 2014, Hernandez sued CarMax and Alan Hanna, one of her supervisors, in Orange Superior Court.[13] Her complaint pleads fifteen claims: (1) discrimination in violation of California Government Code § 12940, *et seq.*;[14] (2) harassment in violation of California Government Code § 12940, *et seq.*;[15] (3) retaliation in violation of California Government Code § 12940, *et seq.*;[16] (4) failure to prevent discrimination, harassment, and retaliation in violation of California Government

2. Notice of Motion and Motion to Dismiss Petition to Compel Arbitration ("MTD"), Docket No. 8 (Dec. 3, 2014). See also Reply in Support of Motion to Dismiss Petition to Compel Arbitration ("MTD Reply"), Docket No. 16 (Mar. 16, 2015).

3. Notice of Motion and Motion to Compel Arbitration ("MTC"), Docket No. 10 (Dec. 30, 2014). See also Reply in Support of Motion to Compel Arbitration ("MTC Reply"), Docket No. 17 (Mar. 9, 2015).

4. See Opposition to Motion to Dismiss Petition to Compel Arbitration ("MTD Opposition"), Docket No. 11 (Feb. 23, 2015); Memorandum in Opposition to Motion to Compel Arbitration ("MTC Opposition"), Docket No. 15 (Mar. 9, 2015).

5. Petition, ¶ 4.

6. *Id.*

7. See *id.*, Exh. A ("DRA")

8. *Id.*, ¶ 4; Exh. A.

9. *Id.*

10. *Id.*, ¶ 4.

11. *Id.*

12. *Id.*, Exhs. B ("2001 DRRP"); C ("2011 DRRP").

13. *Id.*, Exh. D ("Complaint").

14. *Id.*, ¶¶ 32–42.

15. *Id.*, ¶¶ 43–53.

16. *Id.*, ¶¶ 54–65.

Code § 12940(k); [17] (5) failure to provide reasonable accommodations in violation of California Government Code § 12940, *et seq.*; [18] (6) failure to engage in a good faith interactive process in violation of California Government Code § 12940, *et seq.*; [19] (7) violation of the Ralph Civil Rights Act, California Civil Code § 51.7; [20] (8) violation of the Tom Bane Civil Rights Act, California Civil Code § 52.1; [21] (9) gender violence in violation of California Civil Code § 52.4; [22] (10) battery; [23] (11) assault; [24] (12) sexual battery in violation of California Civil Code § 1708.5; [25] (13) declaratory relief; [26] (14) wrongful termination in violation of public policy; [27] and (15) intentional infliction of emotional distress.[28]

CarMax alleges that, prior to filing the state court complaint, Hernandez's attorneys told her in writing of the DRA and her obligation to submit the claims in the complaint to binding arbitration.[29] Notwithstanding such notice, Hernandez purportedly refused to submit her claims to arbitration and directed her attorneys to file the state court action.[30]

**B. Plaintiff's Request for Judicial Notice**

■ CarMax requests that the court take judicial notice of a docket entry in Hernandez's state court action in considering its opposition to Hernandez's motion to dismiss the petition.[31] The request is unopposed.

■ A court can consider evidence in deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, including documents that can be judicially noticed. See, e.g., *Villegas v. United States*, 963 F.Supp.2d 1145, 1158 (E.D.Wash.2013) ("A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction permits a court to consider 'affidavits or any other evidence properly before the court,' even material extrinsic to the pleadings," quoting *Association of Am. Medical Colleges v. United States*, 217 F.3d 770, 778 (9th Cir.2000)); *Ellis v. J.P. Morgan Chase & Co.*, 950 F.Supp.2d 1062, 1072–73 (N.D.Cal.2013) (taking judicial notice of various documents in deciding defendant's Rule 12(b)(1) motion to dismiss); *Smith v. Kim*, No. C 05–01439 JK, 2006 WL 1320483, *2–3 (N.D.Cal. May 15, 2006) (same). Thus, in deciding Hernandez's motion to dismiss, the court can consider material that can be judicially noticed under Rule 201 of the Federal Rules of Evidence. FED. R. EVID. 201. Under Rule 201, the court can take judicial notice of "[o]fficial acts of legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not

---

17. *Id.*, ¶¶ 66–71.

18. *Id.*, ¶¶ 72–79.

19. *Id.*, ¶¶ 80–87.

20. *Id.*, ¶¶ 88–95..

21. *Id.*, ¶¶ 96–104.

22. *Id.*, ¶¶ 105–115.

23. *Id.*, ¶¶ 116–126.

24. *Id.*, ¶¶ 127–136.

25. *Id.*, ¶¶ 137–143.

26. *Id.*, ¶¶ 144–153.

27. *Id.*, ¶¶ 154–170.

28. *Id.*, ¶¶ 171–177.

29. Petition, ¶ 7.

30. *Id.*

31. Request for Judicial Notice in Support of Petitioner CarMax's Opposition to Motion to Dismiss ("RJN"), Docket No. 14 (Feb. 25, 2015).

reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably undisputable accuracy."

■ As noted, CarMax requests that the court take notice of an order issued in the parallel state court proceeding.[32] "Under Federal Rule of Evidence 201, the [c]ourt may take judicial notice of matters of public record if the facts are not 'subject to a reasonable dispute.'" *Olds v. Metlife Home Loans,* No. SACV 12–55 JVS (RNBx), 2012 WL 10420298, *1 n. 1 (C.D.Cal. Mar. 19, 2012) (citing *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001)). Court orders and filings are proper subjects of judicial notice. See, e.g., *United States v. Black,* 482 F.3d 1035, 1041 (9th Cir.2007) (noting that a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n. 6 (9th Cir.2006) (taking judicial notice of pleadings, memoranda, and other court filings); *Asdar Group v. Pillsbury, Madison & Sutro,* 99 F.3d 289, 290 n. 1 (9th Cir.1996) (court may take judicial notice of pleadings and court orders in related proceedings); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir.1992) (a court may take judicial notice "of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relationship to the matters at issue"). Because the document is a proper subject of judicial notice, the court grants CarMax's request, and will consider it in deciding Hernandez's motion.

## II. DISCUSSION

### A. Defendant's Motion to Dismiss the Petition

#### 1. Defendant's Alleged Failure to Meet and Confer

■ CarMax argues that Hernandez's motion should be denied because she failed to comply with Local Rule 7–3.[33] Local Rule 7–3 provides, in relevant part:

> "In all cases ..., counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. The conference shall take place at least seven (7) days prior to the filing of the motion. If the parties are unable to reach a resolution which eliminates the necessity for a hearing, counsel for the moving party shall include in the notice of motion a statement to the following effect: 'This motion is made following the conference of counsel pursuant to L.R. 7–3 which took place on (date).'" CA CD L.R. 7–3.

■ When a party fails to comply with Local Rule 7–3, the court can, in its discretion, refuse to consider the motion. See, e.g., *Singer v. Live Nation Worldwide, Inc.,* No. SACV 11–0427 DOC (MLGx), 2012 WL 123146, *2 (C.D.Cal. Jan. 13, 2012) (denying a motion for summary judgment because the moving party failed to comply with Local Rule 7–3); *Alcatel–Lucent USA, Inc. v. Dugdale Communications, Inc.,* No. CV 09–2140 PSG (JCx), 2009 WL 3346784, *4 (C.D.Cal. Oct. 13, 2009) ("The meet and confer requirements of Local Rule 7–3 are in place for a reason, and counsel is warned that nothing short of strict compliance with the local rules will be expected in this Court. Thus, the

---

**32.** RJN at 1.

**33.** MTD Opposition at 7–8.

motion is ... denied for failure to comply with Local Rule 7–3").

In her reply, Hernandez concedes that she did not meet and confer with CarMax prior to filing the motion to dismiss. She asserts, however, that "the parties subsequently met and conferred, and [she] filed an amended notice [of motion] following" that meeting.[34] This does not constitute compliance with Local Rule 7–3. First, despite Hernandez's representation that she "filed an amended notice following the meet and confer," no such notice has been filed. More fundamentally, an after-the-fact conference does not satisfy Rule 7–3. Counsel must confer *before the motion is filed* so that the parties can determine whether it is possible to come to an agreement that obviates the need for the motion; conferences that take place after the motion has been filed cannot serve this purpose. Accordingly, even if Hernandez met and conferred with CarMax after filing her motion—of which there is no evidence—the court would conclude that she had not complied with the Local Rules.

In its discretion, therefore, the court could deny Hernandez's motion. Failure to comply with the Local Rules does not automatically require the denial of a party's motion, however, particularly where the non-moving party has suffered no apparent prejudice as a result of the failure to comply. See *ECASH Techs., Inc. v. Guagliardo,* 35 Fed.Appx. 498, 500 (9th Cir. May 13, 2002) (Unpub.Disp.) ("The Central District of California's local rules do not require dismissal of appellee's motions for failure to satisfy the meet-and-confer requirements" (citations omitted)); *Brodie v. Board of Trustees of California State University,* No. CV 12–07690 DDP (AGRx), 2013 WL 4536242, *1 (C.D.Cal. Aug. 27, 2013) (considering the merits of a

motion despite counsel's failure to comply with Local Rule 7–3); *Williams–Ilunga v. Gonzalez,* No. CV 12–08592 DDP (AJWx), 2013 WL 571795, *4 (C.D.Cal. Feb. 13, 2013) (same); *Reed v. Sandstone Properties, L.P.,* No. CV 12005021 MMM (VBKx), 2013 WL 1344912, *6 (C.D.Cal. Apr. 2, 2013) (same). The court therefore elects to consider the merits of Hernandez's motion.

### 2. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(1)

Federal courts are courts of limited jurisdiction, and may adjudicate only those cases authorized by the Constitution and by Congress. See *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Attorneys Trust v. Videotape Computer Products, Inc.,* 93 F.3d 593, 594–95 (9th Cir.1996). "The presumption is that a federal court lacks jurisdiction in a particular case until it has been demonstrated that jurisdiction over the subject matter exists." 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2D § 3522 n. 3 (1984). Plaintiffs bear the burden of proving that the court has subject matter jurisdiction to hear the action. See, e.g., *Sopcak v. Northern Mountain Helicopter Serv.,* 52 F.3d 817, 818 (9th Cir.1995); *Stock West, Inc. v. Confederated Tribes,* 873 F.2d 1221, 1225 (9th Cir.1989).

A defendant mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration. See *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee,* 227 F.3d 1214, 1242 (9th

---

**34.** MTD Reply at 4.

Cir.2000) (citation omitted). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of allegations that, by themselves, would otherwise invoke federal jurisdiction. See *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n. 5 (11th Cir.2003) (a jurisdictional challenge was a factual attack where it 'relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings')"); *White*, 227 F.3d at 1242 ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual").

### 3. Whether the Court Has Diversity Jurisdiction to Hear Plaintiff's Petition

 CarMax's petition seeks to compel arbitration under the Federal Arbitration Act.[35] " 'Section 4 of the Federal Arbitration Act (FAA), 9 U.S.C. § 4, authorizes a United States district court to entertain a petition to compel arbitration if the court would have jurisdiction, 'save for [the arbitration] agreement,' over 'a suit arising out of the controversy between the parties.' " *L.A. Fitness International LLC v. Harding*, No. C09–5537–RJB, 2009 WL 3676272, *2 (W.D.Wash. Nov. 2, 2009) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 52–53, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009)). Stated differently, "federal courts must have an independent basis for federal jurisdiction to hear claims under the FAA." *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1111 (9th Cir.2004) (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 15 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Southland Corp. v. Keating*, 465 U.S. 1, 15 n. 9, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984));

*Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.*, 187 F.3d 1045, 1050 (9th Cir.1999) ("It is well established that the FAA does not, on its own, provide a basis for federal question jurisdiction. Rather, § 4 of the FAA 'provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue' " (citation omitted)); *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1287 (9th Cir. 1984) ("Section 4 of the United States Arbitration Act enables a party aggrieved by another's refusal to arbitrate under a written agreement to petition any federal district court for an order compelling arbitration. A district court may employ this provision, however, only when an independent basis of federal jurisdiction already exists," citing *Metro Industrial Painting Corp. v. Terminal Construction Co., Inc.*, 287 F.2d 382, 384 (2d Cir.1961)). In its petition, CarMax invokes the court's diversity jurisdiction under 28 U.S.C. § 1332.[36]

#### a. Legal Standard Governing Diversity Jurisdiction

 Under 28 U.S.C. § 1332(a), "[t]he district courts ... have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between ... citizens of different states." 28 U.S.C. § 1332(a); see also *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir.2003) ("[J]urisdiction founded on [diversity] requires that the parties be in complete diversity and the amount in controversy exceed $75,000"). In any case where subject

**35.** Petition at 1.

**36.** Petition, ¶ 3.

matter jurisdiction is premised on diversity, there must be complete diversity, i.e., all plaintiffs must have citizenship different than all defendants. See *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); see also *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 n. 3, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996).

### b. Whether the Amount in Controversy Requirement is Satisfied

 Although neither party disputes that the amount in controversy requirement is satisfied, the court nonetheless evaluates the allegations of the petition to determine whether more than $75,000 is at issue in this case. Generally, the amount in controversy claimed by a plaintiff in good faith will be determinative of the jurisdictional amount, unless it appears to a legal certainty that the claim is for less than $75,000. See *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938). "When a petition to compel arbitration is involved, 'the amount at stake in the underlying litigation ... is the amount in controversy for purposes of diversity jurisdiction.'" *L.A. Fitness*, 2009 WL 3676272, at *3 (quoting *Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659, 662 (9th Cir.2005)). In the petition, CarMax alleges that the amount in controversy exceeds $75,000, citing the prayer for damages in Hernandez's state court complaint; Hernandez seeks no less than $5,000,000 in damages for CarMax's alleged violations of state law.[37] This suffices to satisfy the amount in controversy requirement. See *L.A. Fitness*, 2009 WL 3676272, at *3 ("Although Ms. Harding does not request a specific amount of damages in her state

action complaint, it is reasonable to assume that she intends to request more than $75,000. The court is satisfied that the statutory amount in controversy for this matter has reasonably been met"); *Home Buyers Warranty Corp. v. Leighty*, No. CV 07–177–PHX–RCB, 2007 WL 4616687, *4 (D.Ariz. Dec. 28, 2007) ("[T]o measure the amount in controversy here, the court will examine the 'underlying [state court] cause[s] of action that w[ill] be arbitrated[,]' as opposed to HBW's complaint seeking to compel arbitration," citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir.1995)); Cf. *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1107–08 (9th Cir. 2010) ("Under the legal certainty standard, the good faith allegations in GeoEx's petition [to compel arbitration] as to the amount in controversy suffice to establish the jurisdictional amount unless it appears legally certain that the amount in dispute is $75,000 or less. Here, GeoEx's petition alleges that Lhotka's damages in the state court action are reasonably in excess of $75,000. GeoEx bases this allegation on the fact that Lhotka's state court complaint requests damages: (1) for the alleged wrongful death of Jason Lhotka, who was 37 years old at the time of the trip, was married, and had at least one dependant; (2) for loss of consortium for his wife and his son; (3) for fraud, misrepresentation, gross negligence, and intentional infliction of emotional distress; (4) for violations of California's consumer fraud statutes; and (5) for funeral, medical, and burial expenses. GeoEx alleged that, based on Lhotka's request in state court, it has a reasonable good-faith belief that the damages exceed $75,000,' even though the state

---

**37.** Petition, ¶ 3; see also Complaint at 29.

court complaint does not specify an amount. This allegation is sufficient to confer subject matter jurisdiction on a federal court because it is not legally certain the amount in controversy is $75,000 or less").

### c. Whether the Complete Diversity Requirement is Satisfied

 The court next evaluates whether there is complete diversity of citizenship between the parties, i.e., whether Hernandez has citizenship different than

all defendants. See *Strawbridge*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435; see also *Caterpillar, Inc.*, 519 U.S. at 68 n. 3, 117 S.Ct. 467. Hernandez does not dispute that her citizenship is diverse from CarMax's.[38] She contends, however, that complete diversity is lacking because Hannah, a California citizen, is named as a defendant in her state court complaint. As a consequence, Hernandez asserts, the court must consider Hannah's citizenship in determining whether it has diversity jurisdiction to hear CarMax's petition.[39] As CarMax

**38.** The petition adequately alleges Hernandez's and CarMax's respective citizenship. An individual like Hernandez is a citizen of the state in which he or she is domiciled. See *Gilbert v. David*, 235 U.S. 561, 569, 35 S.Ct. 164, 59 L.Ed. 360 (1915) (holding that a person is a citizen of the state in which she has her domicile, i.e., a permanent home where she intends to remain or to which she intends to return); *Kanter v. Warner–Lambert Co.*, 265 F.3d 853, 857 (9th Cir.2001) ("A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return"). A party's residence alone does not determine his or her citizenship for purposes of diversity jurisdiction. *Kanter*, 265 F.3d at 857 ("[T]he diversity jurisdiction statute, 28 U.S.C. § 1332, speaks of citizenship, not of residency. To be a citizen of a state, a natural person must first be a citizen of the United States. The natural person's state citizenship is then determined by her state of domicile, not her state of residence.... A person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that state"). Here, in addition to relying on Hernandez's allegation that she is a California resident, CarMax alleges that, for nearly thirteen years, she has worked in California. Allegations that a party has an extensive and continuous period of residence and employment in a state are sufficient to establish that the party is a citizen of the state; this is particularly here as Hernandez does not dispute the point. See *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir.1986) ("[D]etermination of an individual's domicile involves a number of factors (no single factor controlling), including: current residence, voting registration and voting practices, location of brokerage and bank accounts, location

of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes").

The Ninth Circuit treats limited liability companies such as CarMax like partnerships for purposes of diversity jurisdiction. See *Johnson v. Columbia Props. Anchorage LP*, 437 F.3d 894, 899 (9th Cir.2006) (applying the standard used by sister circuits and treating LLCs like partnerships). Thus, "an LLC is a citizen of every state of which its owners/members are citizens." *Id.*; see also *Handelsman v. Bedford Village Assocs., Ltd. Partnership*, 213 F.3d 48, 51–52 (2d Cir.2000) (recognizing that "a limited liability company has the citizenship of its membership"). CarMax alleges that it is a wholly-owned subsidiary of CarMax Auto Superstores West Coast, Inc., which is a Virginia corporation with its principal place of business in Virginia. (See Petition, ¶ 1.) CarMax is thus a citizen of Virginia. As a result, there is complete diversity of citizenship between Hernandez and CarMax.

**39.** MTD at 1 ("The Petition alleges that the Court has diversity jurisdiction over this matter, arguing only that Respondent's state court action seeks a judgment in excess of $5,000,000, thus satisfying the $75,000 threshold. As the petition also admits, the state court action names an additional defendant, Alan Hannah, who is alleged to be a resident of the state of California. Respondent cannot rely upon the state court action to assert diversity jurisdiction for purposes of the amount in controversy, and yet disclaim reliance upon the state court action to the extent it facially destroys diversity jurisdiction. The Petition should be dismissed").

notes in its opposition, however, the Ninth Circuit has considered—and squarely rejected—Hernandez's argument.[40] In *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1106 (9th Cir.2002), Circuit City filed a petition in federal court seeking to stay a state court action and compel arbitration on Najd's claims under the FAA. It asserted that the claims were covered by a "Dispute Resolution Agreement" like the one at issue here. The district court concluded that diversity jurisdiction existed, notwithstanding the fact that Najd's state court complaint named a non-diverse individual defendant. *Najd*, 294 F.3d at 1106. On appeal, Najd advanced the argument Hernandez makes in her motion, i.e., that the court lacked subject matter jurisdiction because of the presence of a non-diverse defendant in the state court action. That defendant, however, was not a party to Circuit City's petition. *Id.* The Ninth Circuit rejected Najd's argument, reasoning that the state court defendant's citizenship was irrelevant in determining whether the district court had diversity jurisdiction to hear the petition:

> "Najd claims that the district court lacked diversity jurisdiction.... Circuit City and Najd, the only parties in this action, are diverse. However, Najd argues that we must consider the citizenship of Khorsand, who is a defendant in the state court action. If Khorsand's citizenship is considered, complete diversity is lacking because Najd and Khorsand are both California residents. *However, the citizenship of someone not before the court is irrelevant to the jurisdictional inquiry.* The district court properly exercised diversity jurisdiction over Circuit City's petition."

*Id.* (citing *We Care Hair Development, Inc. v. Engen*, 180 F.3d 838, 842 (7th Cir.

1999); *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 945 (11th Cir.1999); *Doctor's Associates, Inc. v. Distajo*, 66 F.3d 438, 445–46 (2d Cir.1995) (emphasis added)).

As in *Najd*, it is undisputed that the citizenship of the *parties before the court*, i.e., the parties to CarMax's arbitration petition, is diverse. It is of no consequence that Hannah, who is not a party to the petition, is a California citizen; under *Najd*, "the citizenship of someone not before the court[, i.e., Hannah,] is irrelevant to the jurisdictional inquiry."

Hernandez asserts that *Najd* is no longer good law in light of the Supreme Court's decision in *Vaden v. Discover Bank*, 556 U.S. 49, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009).[41] In *Vaden*, Discover Bank's servicing affiliate sued the plaintiff in state court to recover past-due charges. *Vaden*, 556 U.S. at 53, 129 S.Ct. 1262. Vaden answered and filed counterclaims against Discover, alleging that its finance charges, interest, and late fees violated state law. *Id.* Invoking an arbitration clause in its cardholder agreement with Vaden, Discover filed a § 4 petition in federal court to compel arbitration of Vaden's counterclaims. *Id.* The district court concluded that it had subject matter jurisdiction over the petition because Discover asserted a federal preemption defense to the counterclaims and compelled arbitration. *Id.* After the Fourth Circuit affirmed, the Supreme Court granted certiorari to address "whether district courts, petitioned to order arbitration pursuant to § 4 of the FAA, may 'look through' the petition and examine the parties' underlying dispute to determine whether federal-question jurisdiction exists over the § 4 petition." *Id.* at 57, 129 S.Ct. 1262.

---

40. MTD Opposition at 3–6.

41. MTD Reply at 2–4.

The Court rejected Vaden's argument that the "controversy between the parties ... [was] simply and only the[ir] ... dispute over the arbitrability of their claims." *Id.* at 62–63, 129 S.Ct. 1262. Invoking the language of § 4—i.e., that a party may seek an order compelling arbitration in "any United States district court which, save for [the arbitration] agreement, would have jurisdiction under title 28, in a civil action ... of the subject matter of a suit arising out of the controversy between the parties"—the Court reasoned that the district court was required to "look through" to the "substantive conflict" underlying the petition to determine whether a federal question was presented. *Id.* at 62–63, 129 S.Ct. 1262 ("The phrase 'save for [the arbitration] agreement' indicates that the district court should assume the absence of the arbitration agreement and determine whether it 'would have jurisdiction under title 28' without it: Jurisdiction over what? The text of § 4 refers us to 'the controversy between the parties.' That phrase, the Fourth Circuit said, and we agree, is most straightforwardly read to mean the 'substantive conflict between the parties'" (citation omitted)). "Looking through" to the nature of the dispute between Vaden and Discover, i.e., to the state court counterclaims, the Court held that the Fourth Circuit erred in concluding that the district court had jurisdiction because the purported federal question was raised by a defense to the counterclaims, and defenses "cannot be [used to] invoke [federal question jurisdiction." *Id.* at 70, 129 S.Ct. 1262.

Hernandez relies on the Supreme Court's statement in *Vaden* that the district court should "look through a § 4 petition" to consider the "substantive conflict between the parties" as support for her argument that the court must consider the citizenship of *all parties named in a parallel state court action* to determine if it

can exercise diversity jurisdiction over CarMax's 4 petition. The court is not persuaded.

Most fundamentally, Hernandez's argument ignores the limited scope of the Supreme Court's holding in *Vaden*. The Eighth Circuit's decision in *Northport Health Services of Arkansas, LLC v. Rutherford*, 605 F.3d 483 (8th Cir.2010), is particularly instructive on this point. There, the court addressed the argument Hernandez makes here—that the Vaden "look through" directive applies when the court is determining whether it has diversity jurisdiction to entertain a § 4 petition. *Rutherford*, 605 F.3d at 488–91. After extensive analysis of *Vaden* and relevant authorities, the court concluded that the "look through" approach mandated by the Supreme Court in federal question cases does not "appl[y] in deciding diversity of citizenship ... § 4 disputes." *Id.* at 489. In reaching this conclusion, the *Rutherford* court made several important observations.

First, it addressed "[t]he fundamental flaw in the [ ] contention that *Vaden* implicitly overruled prior circuit court diversity jurisdiction decisions" concluding that a court can consider only the citizenship of the parties to the § 4 petition. The court stated "that [the argument] ignore[d] the underlying facts and the Supreme Court's decision in *Moses H. Cone [Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)]*. In *Moses H. Cone*, the Supreme Court observed that the court had diversity jurisdiction over a § 4 petition and affirmed an order compelling arbitration, notwithstanding the fact that a "non-diverse party [ ] made the parallel state court action [underlying the petition] non-removable." See *Rutherford*, 605 F.3d at 490 (citing *Moses H. Cone*, 460 U.S. at 7 & n. 4, 103 S.Ct. 927). The Eighth Circuit

found it unlikely that the Supreme Court in *Vaden* had "implicitly overruled" *Moses H. Cone* on this point, given that it cited *Moses H. Cone* with approval throughout its opinion. The court also observed that the *Vaden* Court cited cases that employed a "no look-through" approach to diversity jurisdiction, and "carefully limited its statement of the issues and holding to federal question jurisdiction." *Id.* at 490.

Second, the Eighth Circuit noted that, although the Supreme Court described at length "the 'curious practical consequences' of the no-look-through approach to federal question issues," it made no mention of similar concerns associated with employing such an approach where diversity jurisdiction was invoked. *Id.* It found this significant, as the *Vaden* Court "adopted the look-through approach to expand the universe of § 4 cases in which there will be an independent basis of federal question jurisdiction [so that it would] be more compatible with diversity jurisdiction cases (i.e., *Moses H. Cone*)." Adopting the "look-through approach" for diversity jurisdiction, the *Rutherford* court observed, would run counter to the Supreme Court's focus on *expanding* § 4 jurisdiction because it would "severely contract[ ] pre-existing § 4 diversity jurisdiction" under *Moses H. Cone. Id.* at 490–91.

The court agrees with the Eighth Circuit's reasoned analysis, and concludes that the Supreme Court's holding in *Vaden* is not so expansive as to mandate that a district court adopt the "look-through approach" to determine whether it has diversity jurisdiction to hear a § 4 petition. In reaching this conclusion, the court finds particularly significant the expressly limited nature of the *Vaden* Court's approval of the "look-through approach" to assess the existence of federal question jurisdiction. See *Vaden,* 556 U.S. at 62, 129 S.Ct. 1262

("Attending to the language of the FAA and the above-described jurisdictional tenets, *we approve the "look through" approach to this extent: A federal court may "look through" a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law"* (emphasis added)). The court is also cognizant of the well-established principle that the Supreme Court "does not normally overturn, or [ ] dramatically limit, earlier authority[, i.e., *Moses H. Cone* ] sub silentio." *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 18, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000).

The authority Hernandez cites, moreover, does not support her argument to the contrary. Each case cites *Vaden* only for the general proposition that "a federal court has jurisdiction over a petition to compel arbitration if the federal court would have jurisdiction over the underlying substantive dispute." See *Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp.,* 642 F.3d 849, 855 (9th Cir. 2011); *Geographic Expeditions, Inc.,* 599 F.3d at 1106; *In re Wade,* No. 14–CV–03453–LHK, 2014 WL 5088258, *4 (N.D.Cal. Oct. 9, 2014). None of these decisions provides any substantive support for Hernandez's argument, however. In *Countrywide Home Loans* and *Geographic Expeditions, Inc.,* the Ninth Circuit concluded that there was diversity jurisdiction to hear § 4 petitions because there was complete diversity of citizenship among the parties; in neither decision did the court indicate that the parties to the federal action were different than the parties to the underlying state action. Nor did either address whether, assuming this was the case, complete diversity should be assessed by looking to the citizenship of the parties to the underlying state action. See *Countrywide Home Loans,* 642 F.3d at 855 n.2 (it is undisputed that the "parties are completely diverse"); *Geographic Ex-*

*peditions, Inc.,* 599 F.3d at 1106 n. 4 ("The parties concede this is a suit between citizens of different states"). Given the Ninth Circuit's explicit holding in *Najd,* moreover, it would appear the *Countrywide Home Loans* and *Geographic Expeditions, Inc.* courts determined complete diversity by looking to the parties to the § 4 petition in federal court.

*In re Wade* is similarly of little help; the court notes in summary fashion that "[it was] simply not the case [t]here" that "the matter involve[d] a question of federal law, or [that] it involve[d] diverse parties." *In re Wade,* 2014 WL 5088258, at *4. Finally, *Anaya v. Lowe's Home Centers, LLC,* No. 14cv1260 L(BGS), 2014 WL 2199878, *1 (S.D.Cal. May 27, 2014), is clearly distinguishable, as it addressed removal jurisdiction rather than a petition to compel arbitration under the FAA; the decision makes no reference whatsoever to *Vaden.*

In sum, for the reasons stated, the court declines to extend the limited approval of the "look-through" approach announced in *Vaden* to the question of diversity jurisdiction in this case.[42]

42. In reaching this conclusion, the court joins all federal courts throughout the country that have been addressed a similar question following the Supreme Court's decision in *Vaden.* See, e.g., *Rutherford,* 605 F.3d at 491 ("For all these reasons, we decline to conclude that *Moses H. Cone* was implicitly overruled *sub silentio* in *Vaden.* Therefore, *Moses H. Cone* continues to be precedent that resolves these appeals. As the Supreme Court has frequently instructed, '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.' Likewise, *Vaden* did not implicitly overrule ... the pre-*Vaden* § 4 diversity jurisdiction decisions from other circuits. Therefore, we conclude that diversity of citizenship is determined in these cases by the citizenship of the parties named in the proceedings before the district court" (citations omitted)); *Golden Gate National Senior Care, LLC v. Addison,* Misc. No. 14–mc–0421, 2014 WL 4792386, *6 (M.D.Pa. Sept. 24, 2014) ("Notwithstanding Respondents' logical arguments highlighting the potential problems with following *Rutherford*'s position of the limited application of *Vaden* to only federal question cases, the court finds more persuasive the Supreme Court's purposeful omission of diversity cases from its holding in *Vaden.* This does not result in, as Respondents suggest, this court 'willfully disregard[ing]' its obligation to determine 'whether it has jurisdiction over an underlying dispute when presented with a [Section] 4 petition to compel arbitration.' Indeed, based on the parties of this action, the court clearly has jurisdiction based on diversity of citizenship. However, the court does not find Respondents' 'diversity look through' argument compelling and declines to look through the present federal action to determine whether it would have diversity jurisdiction over the state court action"); *Brookdale Sr. Living Inc. v. Stacy,* 27 F.Supp.3d 776, 782 (E.D.Ky.2014) ("At least one district court within this circuit has similarly noted that *Vaden* is limited to cases involving federal question jurisdiction. And in an opinion this Court finds persuasive, the Eighth Circuit Court of Appeals reached the same conclusion. Accordingly, the Court will not look through the present action for arbitration to determine whether it would have diversity over the state-law suit," citing *Credit Acceptance Corp. v. Davisson,* 644 F.Supp.2d 948, 953 (N.D.Ohio 2009) (noting that "the *Vaden* Court explicitly limited its holding to cases where the controversy underlying the § 4 petition involves federal-question jurisdiction")); *Sun Healthcare Group, Inc. v. Dowdy,* No. 5:13–CV–00169–TBR, 2014 WL 790916, *4 (W.D.Ky. Feb. 26, 2014) ("While not binding, the Court is persuaded by the well-reasoned analysis in [*Rutherford*]. As the Eighth Circuit recognized, Defendant's argument for applying the 'look through' analysis in this case distorts the Supreme Court's decision in *Vaden.* It ignores that *Vaden* involved a federal-question, explicitly stated it was only applicable to federal-question cases, and that the circuit conflict it sought to resolve involved only federal-question cases. *Vaden* did not mandate a new analysis for § 4 diversity jurisdiction disputes. Furthermore, *Moses H. Cone* is persuasive because the Supreme Court found the independent basis of federal

**1096**

■ Consequently, *Najd*, which is directly on point, controls. See *L.A. Fitness*, 2009 WL 3676272, at *2–3 ("This case is fundamentally different than *Vaden*. We are not dealing with federal question jurisdiction here; rather, this action is brought into federal court on the basis of complete diversity between the parties.... While Ms. Harding's argument appears to logically flow from the Supreme Court's holding in *Vaden*, the Ninth Circuit has explicitly ruled otherwise in the context of diversity jurisdiction.... While [*Najd*] predates the Supreme Court's ruling in *Vaden*, and the language in *Vaden* is broad enough to suggest that the court may look favorably on allowing district courts to 'look' to an

underlying action for diversity purposes, doing so here would be an extension of the law as it currently exists, and is not necessary here. The Ninth Circuit authority is clear—in a petition to compel arbitration, the court is only concerned with the parties in front of it for purposes of diversity. There is no reason to 'look through' to the underlying action in order to determine diversity. In the present matter, L.A. Fitness and Ms. Harding are diverse parties, and this court may entertain the plaintiff's petition to compel arbitration"); see also *Nichols v. Harris*, 17 F.Supp.3d 989, 993 (C.D.Cal.2014) ("A panel decision of the Ninth Circuit is binding on lower court as soon as it is published, even before the mandate issues, and remains binding au-

jurisdiction was diversity of citizenship, but the Court—despite noting the existence of a non-diverse party in the underlying state court action—did not address a would[-]be defect in diversity jurisdiction based on Defendant's interpretation of *Vaden*. Therefore, as was recognized in [*Rutherford*], Defendant's contention would require this Court to assume the Supreme Court 'overlooked a serious diversity jurisdiction issue in *Moses H. Cone* and then implicitly overruled *Cone*'s jurisdictional underpinnings in *Vaden*.' 'The Supreme Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.' Therefore, in this case, for purposes of determining if diversity of citizenship exists, we look only to the citizenship of the parties to the federal action" (citation omitted)); *THI of New Mexico at Hobbs Center, LLC v. Spradlin*, 893 F.Supp.2d 1172, 1178–79 (D.N.M.2012) ("In support of his argument that the Court should 'look through' the Complaint to determine jurisdiction, Defendant relies on *Vaden v. Discover Bank*, in which the Supreme Court held that a federal court entertaining a petition to compel arbitration based upon federal question jurisdiction 'should determine its jurisdiction by 'looking through' a § 4 petition to the parties' underlying substantive controversy.' *Vaden*, however, is limited to Section 4 petitions based upon federal question jurisdiction. Where federal jurisdiction is based on diversity, 'circuit decisions [have been] unanimous in looking only to the citizenship of the parties to the

federal action.' Accordingly, *Vaden* is inapplicable here, where jurisdiction is founded on diversity of citizenship between the parties, rather than on the presence of a federal question," citing *THI of New Mexico at Hobbs Center v. Patton*, 851 F.Supp.2d 1281, 1287–88 (D.N.M.2011)); *Garner v. BankPlus*, 484 B.R. 134, 139–40 (S.D.Miss.2012) ("*Vaden* was limited to determinations of federal question jurisdiction under 28 U.S.C. § 1331. Indeed, in the wake of the Court's Vaden decision, courts that have considered the issue have held consistently that Vaden's 'look through' is limited to § 4 petitions based on federal question jurisdiction" (citations omitted)); *Minnesota Life Ins. Co. v. Mungo*, C/A No. 0:11–681–JFA, 2011 WL 2518768, *1 (D.S.C. June 23, 2011) ("Mungo contends that the court must 'look through' to the underlying action, and because there is a non-diverse defendant in that case (Founders), there can be no diversity jurisdiction in this action. Mungo relies heavily on the *Vaden* case for her contention, and both parties discuss the case at length in their briefs. MLIC argues that the *Vaden* decision is limited to cases involving federal question jurisdiction and insists that it does not alter the rule established in *Moses Cone*. In the absence of clear authority instructing this court to follow the reasoning in *Vaden* and because diversity jurisdiction was not at issue in that case, the court declines to base its analysis of the instant motion on that decision").

thority until the decision is withdrawn or reversed by the Supreme Court or an *en banc* court," citing *Gonzalez v. Arizona,* 677 F.3d 383, 389 n. 4 (9th Cir.2012) (en banc) ("[A] published decision of this court constitutes binding authority which 'must be followed unless and until overruled by a body competent to do so,'" citing *Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir. 2001)). Because the citizenship of the parties to this action is completely diverse, and because the amount in controversy requirement has been satisfied, the court has diversity jurisdiction to hear CarMax's petition. Accordingly, Hernandez's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is denied.

### B. Plaintiff's Motion to Compel Arbitration and Stay State Court Proceedings

### 1. Legal Standard Governing Motions to Compel Arbitration

The Federal Arbitration Act ("FAA") provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA, which governs petitions to compel arbitration, provides that

"[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing

the parties to proceed to arbitration in accordance with the terms of the agreement...." 9 U.S.C. § 4.[43]

 In enacting the FAA, Congress "declared a national policy favoring arbitration" that was intended to reverse centuries of judicial hostility to arbitration agreements. *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); see *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 475 n. 8 (9th Cir.1991) ("The Federal Arbitration Act of 1925 ... reflects the strong Congressional policy favoring arbitration by making such clauses 'valid, irrevocable, and enforceable,'" quoting 9 U.S.C. § 2); *Arreguin v. Global Equity Lending, Inc.,* No. C 07–06026 MHP, 2008 WL 4104340, *4 (N.D.Cal. Sept. 2, 2008) (stating that the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary,'" quoting *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927). As a result, the FAA requires that courts "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *id.* at 218, 105 S.Ct. 1238 ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that. district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," citing 9 U.S.C. §§ 3, 4 (emphasis original)); see also *Moses H. Cone,* 460 U.S. at 22–23, 103 S.Ct. 927.

 Despite this strong policy favoring arbitration, "'arbitration is a matter of contract and a party cannot be re-

---

**43.** The statute further provides: "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily

to the trial thereof. If no jury trial be demanded by the party alleged to be in default ... the court shall hear and determine such issue." 9 U.S.C. § 4.

quired to submit to arbitration any dispute which he has not agreed so to, submit.'" *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); see also *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (explaining that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"); *Van Ness Townhouses v. Mar Indus. Corp.,* 862 F.2d 754, 756 (9th Cir.1989) ("When we are asked to compel arbitration of a dispute, our threshold inquiry is whether the parties agreed to arbitrate"). "While ambiguities in the language of [an] agreement should be resolved in favor of arbitration, [courts] do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (citation omitted); *see also Park-Knit Mills, Inc. v. Stockbridge Fabrics Company, Ltd.,* 636 F.2d 51, 54 (3d Cir. 1980) ("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect").

■ A district court's "role under the [FAA] is ... limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000) (citations omitted).

■ When evaluating whether a party is bound by an arbitration agreement, "the liberal federal policy regarding the scope of arbitrable issues is inapposite." *Comer v. Micor, Inc.,* 436 F.3d 1098, 1104 n. 11 (9th Cir.2006); *Chastain v. Union Security Life Insurance Co.,* 502 F.Supp.2d 1072, 1075 (C.D.Cal.2007) (where the issue is whether parties are bound by an arbitration agreement, "the Court is not bound by [the] ... policy encouraging arbitration in reviewing plaintiffs' motion"). The issue instead is determined according to ordinary principles of contract law. *Waffle House,* 534 U.S. at 293, 122 S.Ct. 754 (in deciding whether a valid agreement to arbitrate exists, federal courts must "place arbitration agreements on equal footing with other contracts"); *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1170 (9th Cir.2003) ("[T]o evaluate the validity of an arbitration agreement, federal courts 'should apply ordinary state-law principles that govern the formation of contracts,'" quoting *First Options of Chicago,* 514 U.S. at 944, 115 S.Ct. 1920)); *see also Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069, 1073 (5th Cir.2002) ("[The] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead '[o]rdinary contract principles determine who is bound,'" quoting *Daisy Manufacturing Co. v. NCR Corp.,* 29 F.3d 389, 392 (8th Cir.1994)); *Flores v. Jewels Marketing and Agribusiness,* No. CIV–F 07–334 AWI WMW, 2007 WL 2022042, *6 (E.D.Cal. July 9, 2007) (same). Accordingly, arbitration agreements "are subject to all defenses to enforcement that apply to contracts generally." *Ingle,* 328 F.3d at 1170.

■ "[A]n arbitration agreement may not function so as to require employees to

waive potential recovery for substantive statutory rights in an arbitral forum, especially for statutory rights established 'for a public reason.'" *Davis v. O'Melveny & Myers,* 485 F.3d 1066, 1075 (9th Cir.2007) (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and *Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal.4th 83, 100, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000)); see also *Arreguin v. Global Equity Lending, Inc.,* No. C 07–06026 MHP, 2008 WL 4104340, *6 (N.D.Cal. Sept. 2, 2008) ("parties that agree to arbitrate statutory claims . . . are entitled to basic procedural and remedial protections so that they can effectively realize their statutory rights." quoting *Ting v. AT & T,* 319 F.3d 1126, 1151 (9th Cir. 2003)).

▆▆▆ Thus, to be enforceable, an agreement to arbitrate claims based on statutory rights must meet minimum requirements first articulated in *Cole v. Burns International Sec. Services,* 105 F.3d 1465 (D.C.Cir.1997). Specifically, they must "(1) provide[ ] for neutral arbitrators, (2) provide[ ] for more than minimal discovery, (3) require[ ] a written award, (4) provide[ ] for all types of relief that would otherwise be available in court, and (5)[ ] not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." See *id.* at 1482 (applying *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647); see also *Arreguin,* 2008 WL 4104340, at *4 (listing the *Cole* factors, and noting that "[b]oth the Ninth Circuit and the California Supreme Court have cited . . . this portion of *Cole* with approval," citing *Ting,*

319 F.3d at 1151, and *Armendariz,* 24 Cal.4th at 102, 99 Cal.Rptr.2d 745, 6 P.3d 669).

▆▆▆ In addition, "generally applicable defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements" between employers and employees. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Because Hernandez was employed in California, the court must apply California law to determine whether the arbitration agreement is unconscionable. See *Ingle,* 328 F.3d at 1170 ("Ingle was employed in California; we therefore evaluate Circuit City's arbitration agreement under the contract law of that state").

### 2. Whether the Court Should Grant Plaintiff's Motion to Compel

#### a. Whether the FAA Applies to the Parties' Agreement

As an initial matter, Hernandez contends that CarMax's motion must be denied because the FAA does not apply to her arbitration agreement with CarMax.[44] Specifically, she argues that her employment contract with CarMax did not concern interstate commerce and her job duties did not "bear on interstate commerce in a substantial way."[45]

▆▆▆ "The FAA applies to any contract affecting interstate commerce." *Yahoo! Inc. v. Iversen,* 836 F.Supp.2d 1007, 1009 (N.D.Cal.2011) (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)); see *Kramer v. Toyota Motor Corp.,* 705 F.3d 1122, 1126

---

44. MTC Opposition at 4–6.

45. *Id.* at 5 ("Respondent was a management assistant performing administrative tasks at the Buena Park location in California, and her job duties had nothing to do with inter-

state commerce. CarMax's motion fails to establish that Respondent's specific job and job duties bears upon interstate commerce in any substantial way as required").

(9th Cir.2013) ("With limited exceptions, the Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce" (citation omitted)); *Tompkins v. 23andMe, Inc.,* Nos. 5:13–CV–05682–LHK, 5:14–CV–00294–LHK, 5:14–CV–00429–LHK, 5:14–CV–01167–LHK, 5:14–CV–01191–LHK, 5:14–CV–01258–LHK, 5:14–CV–01348–LHK, 5:14–CV–01455–LHK, 2014 WL 2903752, *4 (N.D.Cal. June 25, 2014) ("The Federal Arbitration Act ('FAA') applies to arbitration agreements in any contract affecting interstate commerce,'" citing *Circuit City Stores,* 532 U.S. at 119, 121 S.Ct. 1302)). Section 2 of the FAA states:

> "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The Supreme Court has held that the FAA applies to employment contracts if the employment affects interstate commerce. See, e.g., *Herrera v. CarMax Auto Superstores California, LLC,* No. CV–14–776–MWF (VBKx), 2014 WL 3398363, *3 (C.D.Cal. July 2, 2014) ("The FAA applies to written arbitration agreements in 'contract[s] evidencing a transaction involving commerce.' An employment contract including an agreement to arbitrate can be subject to the FAA, if it is not expressly exempted by the FAA and if the employment affects interstate commerce," citing *Circuit City Stores,* 532 U.S. at 113, 119, 121 S.Ct. 1302 (rejecting an argument that

an employment agreement is not a "contract evidencing a transaction involving interstate commerce," and holding that 9 U.S.C. § 1 does not exempt all employment contracts from the FAA)); *Plows v. Rockwell Collins, Inc.,* 812 F.Supp.2d 1063, 1066 (C.D.Cal.2011) ("The FAA, which provides that 'a written provision in any ... contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract,' applies to transactions involving interstate commerce, including employment agreements where the employment relationship involves interstate commerce," citing *Circuit City Stores* ); *Slaughter v. Stewart Enterprises, Inc.,* No. C 07–01157 MHP, 2007 WL 2255221, *5 (N.D.Cal. Aug. 3, 2007) ("[T]he FAA undisputably reaches some employment contracts," citing *Circuit City Stores* ).

The term "involving commerce" "signals an intent to exercise Congress' commerce power to the full." *Circuit City Stores,* 532 U.S. at 115, 121 S.Ct. 1302 (citing *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)). Given that the statute "provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,'" *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (citing *Perry v. Thomas,* 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)), the Court has held that "the FAA encompasses a wider range of transactions than those actually 'in commerce'—that is 'within the flow of interstate commerce.'" *Id.* at 56, 123 S.Ct. 2037 (citing *Allied–Bruce,* 513 U.S. at 277, 115 S.Ct. 834).

Hernandez argues that CarMax has "fail[ed] to establish that [her] specific

job and job duties [bore] upon interstate commerce in any substantial way as required," and thus that the FAA does not apply.[46] CarMax counters that it has demonstrated that Hernandez's employment agreement "evidenc[ed] a transaction involving commerce" within the meaning of § 2 of the FAA.[47] The court agrees.

CarMax proffers the declaration of Kimberly Ross, its vice president of human resources.[48] Ross states that CarMax is a "national sales organization," with sales locations in thirty-six states.[49] She asserts that CarMax customers regularly review the national sales inventory to find a vehicle that best suits their needs.[50] If a customer chooses a vehicle that is located out-of-state, CarMax sales consultants arrange for transport of the vehicle from the out-of-state sales location.[51] Ross reports that CarMax sales consultants and employees regularly "respond to inquiries from other CarMax locations that may be out[side] ... California and arrange for transport of vehicles from their location to a location out-of-state."[52] With respect to management assistants, like Hernandez, Ross states that they "support the[ ] national sales efforts" at CarMax.[53] They purportedly hire CarMax employees, including sales consultants; make travel arrangements for CarMax employees, including travel out-of-state; and serve as a liaison to CarMax's corporate offices located in Virginia.[54]

The evidence proffered by CarMax suffices to demonstrate that Hernandez's employment contract with CarMax "involv[ed] [interstate] commerce." It is undisputed that Hernandez was employed by a national corporation that did business in thirty-six states and engaged in interstate transactions on a regular basis. CarMax has also adduced evidence that Hernandez's job directly involved interstate commerce in that management assistants (1) hire employees who engage in interstate activity; (2) correspond with CarMax's corporate offices in Virginia; and (3) make out-of-state travel arrangements. Courts have concluded that similar employment relationships have a sufficient connection in interstate commerce that they are subject to the FAA. See, e.g., *Herrera,* 2014 WL 3398363, at *2–3 (concluding that an employment contract between CarMax and three former employees—a painter, service mechanic, and automotive service technician—involved interstate commerce); *Montes v. San Joaquin Community Hospital,* No. 1:13–cv–01722–AWI–JLT, 2014 WL 334912, *5 (E.D.Cal. Jan. 29, 2014) (concluding that an employment contract between plaintiff and a hospital was governed by the FAA because the hospital's activities were involved interstate commerce); *Abdullah v. Duke University Health System, Inc.,* No. 5:09–CV–8–FL, 2009 WL 1971622, *3 (E.D.N.C. July 8, 2009) (concluding that an employment contract between a hospital and the plaintiff "involve[d] interstate commerce because DUHS treats patients

---

46. MTC Opposition at 5.

47. MTC Reply at 2–6.

48. Declaration of Kimberly Ross in Support of CarMax Auto Superstores California, LLC, A Virginia Limited Liability Company's Motion to Compel Arbitration and Stay State Court Action ("Ross Decl."), Docket No. 10–1 (Dec. 30, 2014).

49. Ross Decl., ¶ 8.

50. *Id.*

51. *Id.*

52. *Id.*

53. *Id.,* ¶ 9.

54. *Id.*

from all over the country and the world, it receives payments from individuals and entities other than North Carolina residents, and its employees travel outside of North Carolina"); *Collie v. Wehr Dissolution Corp.*, 345 F.Supp.2d 555, 561 & n. 2, 3 (M.D.N.C.2004) (concluding that plaintiff's employment contract "involve[d] commerce" and thus was governed by the FAA because his employer, National Hearing Centers, Inc., was a "national corporation[ ] involved in interstate commerce," rejecting a contention that the "employment contract allegedly did not 'actually involv[e] interstate commerce,'" and observing that, although plaintiff's job duties had a limited relationship to interstate commerce, he had engaged in-terstate commerce when he, *inter alia*, "corresponded with National Hearing Centers, Inc.'s [out-of-state] office"); see also *Allied–Bruce*, 513 U.S. at 282, 115 S.Ct. 834 (concluding that a relationship involved interstate commerce where, *inter alia*, defendant was a national corporation that was engaged in business in multiple states).[55] Accordingly, the court concludes that the FAA is applicable to the parties' arbitration agreement.[56]

### b. Whether the Parties' Arbitration Agreement is Valid

#### (1) Legal Standard Governing Unconscionability

 Hernandez argues that the arbitration agreement is unconscionable and

---

55. The single case cited by Hernandez as support for her contention that the FAA does not apply—The California Court of Appeal's decision in *Hoover v. American Income Life Ins. Co.*, 206 Cal.App.4th 1193, 142 Cal.Rptr.3d 312 (2012)—is distinguishable. There, the court concluded that defendant had not met its burden of showing that the FAA applied because it had adduced no evidence "establishing the relationship between Hoover and AIL." *Hoover*, 206 Cal.App.4th at 1207, 142 Cal.Rptr.3d 312. The court noted that defendant had established only that "Hoover was a California resident who sold life insurance policies," and that "AIL [was] based in Texas." *Id.* Given the dearth of evidence, the court concluded that AIL had not shown that the employment relationship "had a specific effect or 'bear[ing] on interstate commerce in a substantial way." *Id.*

Here, in contrast to *Hoover*, CarMax has adduced evidence concerning the extent of its interstate activities. (See Ross Decl., ¶ 8.) It has also shown that Hernandez's job affected interstate commerce in that management assistants hired employees who sold and transported vehicles across state lines, served as liaisons to CarMax's out-of-state corporate offices, and arranged interstate travel for CarMax employees. (Ross Decl., ¶ 9.) No evidence of this type was proffered in *Hoover*. As the authorities cited indicate, such evidence is sufficient to show that an employment relationship involves interstate commerce under the FAA.

56. Even if the FAA did not apply, Hernandez fails to identify the effect on the arbitrability analysis if the California Arbitration Act ("CAA"), rather than the FAA applied. As one California district court has observed:

"The CAA, like the FAA, favors arbitration. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 98, 99 Cal. Rptr.2d 745, 6 P.3d 669 (2000). The California Supreme Court has observed, 'Two years after the FAA was enacted, this state adopted its first modern arbitration statute (Stats.1927, ch. 225), declaring arbitration agreements to be irrevocable and enforceable in terms identical to those used in section 2 of the federal act, and since that time California courts and its Legislature have 'consistently reflected a friendly policy toward the arbitration process.' That policy was expanded and clarified in the current arbitration statute which was adopted in 1961 (Stats.1961, ch. 461, § 2 *et seq.*), and it continues to be the policy of this state." *Keating v. Superior Court*, 31 Cal.3d 584, 601–02, 183 Cal.Rptr. 360, 645 P.2d 1192 (1982). The Court has noted further, '[U]nder California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts.' *Armendariz*, 24 Cal.4th at 98, 99 Cal.Rptr.2d 745, 6 P.3d 669." *Montes*, 2014 WL 334912, at *5 n. 1.

thus unenforceable. As the party opposing arbitration, Hernandez bears the burden of establishing that unconscionability is a defense to enforceability. See, e.g., *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1296 (9th Cir.2006) (en banc); *Sossamon v. Central Valley RV Outlet, Inc.*, No. F043318, 2004 WL 1418733, *2 (Cal.App. June 25, 2004) (Unpub.Disp.) ("The party opposing arbitration bears the burden of proof for any defense that may exist to the arbitration agreement").[57]

The California Supreme Court's decision in *Armendariz* "provides the definitive pronouncement of California law on unconscionability to be applied to mandatory arbitration agreements." See *Ferguson v. Countrywide Credit· Industries, Inc.*, 298 F.3d 778, 782–83 (9th Cir.2002). Prior to *Armendariz*, California courts applied two distinct analytical frameworks in assessing whether a contract was unconscionable. See *Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 1317, 27 Cal.Rptr.3d 797 (2005) ("In California, two separate approaches have developed for determining whether a contract or provisions thereof [are] unconscionable"); see also *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App.4th 846, 852–53 & n. 6, 113 Cal. Rptr.2d 376 (2001) (explaining the two frameworks); *Patterson v. ITT Consumer Financial Corp.*, 14 Cal.App.4th 1659, 1663–64, 18 Cal.Rptr.2d 563 (1993) ("Two alternative analyses exist under California law for determining whether a contractual provision will be enforceable because it is unconscionable"). In *Armendariz*, the Supreme Court cited both tests with approval but did not treat them as separate. See

*Armendariz*, 24 Cal.4th at 113–14, 99 Cal. Rptr.2d 745, 6 P.3d 669.

Under the first test, which derives from *Graham v. Scissor–Tail, Inc.*, 28 Cal.3d 807, 817–20, 171 Cal.Rptr. 604, 623 P.2d 165 (1981), courts look first to whether the agreement at issue is a contract of adhesion. See *Armendariz*, 24 Cal.4th at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion," citing *Graham*, 28 Cal.3d at 817–19, 171 Cal.Rptr. 604, 623 P.2d 165). A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id.* (quoting *Neal v. State Farm Ins. Cos.*, 188 Cal.App.2d 690, 694, 10 Cal. Rptr. 781 (1961)). If an agreement is a contract of adhesion, the court must consider both whether the terms are contrary to the expectations of the weaker party, and whether they are otherwise unduly oppressive. See *id.* ("Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable'" (citations and internal quotation marks omitted)).

---

**57.** "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005

WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

The second test derives from *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 485–88, 186 Cal.Rptr. 114 (1982). See *Flores*, 93 Cal.App.4th at 852–53, 113 Cal. Rptr.2d 376. Under this test, courts ask whether a contract is both "procedurally" and "substantively" unconscionable. See *Armendariz*, 24 Cal.4th at 114, 99 Cal. Rptr.2d 745, 6 P.3d 669 ("[U]nconscionability has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided results," quoting *A & M Produce Co.*, 135 Cal.App.3d at 486–87, 186 Cal.Rptr. 114 (internal quotation marks omitted)). "The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or caluse under the doctrine of unconscionability." *Id.* (citing *Stirlen v. Supercuts, Inc.*, 51 Cal. App.4th 1519, 1533, 60 Cal.Rptr.2d 138 (1997)). "[T]hey need not[, however,] be present in the same degree.... [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

The different phrasing of the two tests has produced some confusion. In particular, *Armendariz*'s statement that "[u]nconscionability analysis begins with an inquiry into whether the contract is one of adhesion," *id.* at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669, has led some courts to conclude that a contract must be adhesive to be unconscionable. See *Morris*, 128 Cal. App.4th at 1317, 27 Cal.Rptr.3d 797 ("Each of the two approaches has generated some confusion in its application. For example, the *Graham* approach commences with a determination of whether the contract is one of adhesion, thus fostering the impression that a nonadhesion contract may never be unconscionable"). While *Armendariz*'s statement that adhesiveness is the starting point for unconscionability analysis may have generated confusion, the Court also made clear that *any* contract or contract term may be unconscionable if it is "unduly oppressive." See *Armendariz*, 24 Cal.4th at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("The second [judicially imposed limitation on enforcement of adhesion contracts]—*a principle of* equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable'" (emphasis added and internal quotation marks omitted)).

The *Graham* test is thus best understood as a specific application of the "sliding scale" adopted in *A & M Produce*. Because "[a] finding of a contract of adhesion is essentially a finding of procedural unconscionability," *Flores*, 93 Cal.App.4th at 853, 113 Cal.Rptr.2d 376, the *Graham* test simply describes the degree of substantive unconscionability that must be present before it is appropriate to refuse to enforce an adhesive contract or term on grounds of unconscionability. The California Supreme Court has observed, in fact, that the *Graham* and *A & M Produce* frameworks produce identical results. See *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 925 n. 9, 216 Cal.Rptr. 345, 702 P.2d 503 (1985).

### (2) Whether the 2001 or 2011 DRRP is Applicable

■ Before considering whether Hernandez and CarMax entered into a valid, enforceable arbitration agreement, the court must first determine whether the 2001 or 2011 DRRP reflects that agreement. Hernandez asserts that unconscionability must be measured "at the time the agreement is entered into, not when it is

sought to be enforced." She thus maintains that the 2001 DRRP, which was in effect when she began her employment with CarMax, controls.[58] For its part, CarMax argues that unconscionability should be judged by looking to the 2011 DRRP because the DRRP was validly modified as authorized by Rule 19, set forth therein. For this reason, it asserts the most recent DRRP—i.e., the 2011 version—controls.

Rule 19 of the 2001 DRRP included a modification clause stating:

> "CarMax may alter or terminate the .Agreement and these Dispute Resolution Rules and Procedures on December 31st of any year upon giving 30 calendar days written notice to Associates, provided that all claims arising before alteration or termination shall be subject to the Agreement and corresponding Dispute Resolution Rules and Procedures in effect at the time the Arbitration Request Form and accompanying filing fee, or Request for Waiver of Filing Fee is received by the Company. Notice may be given by posting a written notice by December 1 of each year at all CarMax locations (including locations of affiliated companies). A copy of the text of any modification to the Agreement or Rules and Procedures will be published in the Applicant Packet, which will be available at such locations after December 31 of each year." [59]

Hernandez does not dispute that CarMax provided the notice required by Rule 19 or that it validly modified the DRRP. Rather, she appears to contend that the modified DRRP does not apply because it was not in effect at the time she entered into the DRA, and thus cannot govern any of her claims. While it is true that "[t]he court determines unconscionability with reference to the time the con-

tract is entered into," *Lanigan v. City of Los Angeles,* 199 Cal.App.4th 1020, 1035, 132 Cal.Rptr.3d 156 (2011), Hernandez fails to appreciate that "a subsequent written contract alters the terms of a previous contract," *Thiele v. Merrill Lynch, Pierce, Fenner & Smith,* 59 F.Supp.2d 1060, 1064 (S.D.Cal.1999).

It is for this reason that courts considering modifications to arbitration clauses have found that, when a term has been altered through a *valid modification,* unconscionability is judged with reference to the *modified* provision, rather than the original, superceded provision. See, e.g., *Herrera,* 2014 WL 3398363, at *4–5 (applying the 2011 DRRP, which was different than that in effect on the date the employees signed the agreement, and rejecting plaintiff's argument that the agreement was illusory because it could be modified unilaterally by CarMax, as CarMax had followed the prescribed notice procedures and that procedure and the covenant of good faith and fair dealing limited CarMax's ability to make unilateral modifications and save the agreement from being illusory); *Casas,* 224 Cal.App.4th at 1236–37, 169 Cal.Rptr.3d 96 (concluding that the 2011 DRRP applied to plaintiff's claims, rather than the DRRP in effect when he was first hired, and holding that " '[t]he implied covenant of good faith and fair dealing limits the employer's authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable,' " quoting *Serpa v. California Surety Investigations, Inc.,* 215 Cal.App.4th 695, 708, 155 Cal. Rptr.3d 506 (2013)). Compare *Ferguson,* 298 F.3d 778, 786 (9th Cir.2002) (in assessing the unconscionability of an arbitration agreement, the court declined to consider a fee provision included in a subsequent arbitration agreement, holding "the pur-

---

**58.** MTC Opposition at 6–8.

**59.** Ross Decl., Exh. B ("2001 DRRP") at 20.

**1106**

ported modification [was] invalid because Countrywide did not follow its company modification procedure," citing *Mercuro v. Superior Court,* 96 Cal.App.4th 167, 181–82, 116 Cal.Rptr.2d 671 (2002)).

Because Hernandez does not dispute that CarMax validly modified the DRRP in accordance with Rule 19, the court concludes that the 2011 DRRP is the effective arbitration agreement for purposes of CarMax's petition.[60] See *Herrera,* 2014 WL 3398363, at *5 ("CarMax followed this modification provision by posting notices that the DRRP would be modified. Plaintiffs do not indicate that they stopped

**60.** At the hearing, Hernandez reiterated her the argument that unconscionability must be judged by looking to the DRRP that was in effect at the time she entered into an employment contract with CarMax and signed the DRA. She cited *Fitz v. NCR Corp.,* 118 Cal. App.4th 702, 13 Cal.Rptr.3d 88 (2004), and *Harper v. Ultimo,* 113 Cal.App.4th 1402, 7 Cal.Rptr.3d 418 (2003), as support for this proposition. *Fitz* and *Harper* are distinguishable, and do not require that the court consider the unconscionability of the 2001 DRRP rather than the 2011 modified DRRP.

In *Fitz,* plaintiff began to work for NCR Corp. in 1981. Beginning in 1996, the company implemented a mandatory, binding arbitration policy. *Fitz,* 118 Cal.App.4th at 708–09, 13 Cal.Rptr.3d 88. In 2000, NCR amended the terms of the policy to comply with the requirements set forth in *Armendariz* by excising certain provisions of the 1996 policy. *Id.* at 709, 13 Cal.Rptr.3d 88. The policy was amended in accordance with authority granted NCR in the 1996 policy. *Id.*

Prior to considering the merits of the trial court's decision regarding unconscionability, the appellate court addressed Fitz's contention that the 1996 policy should be considered in its entirety when determining whether the policy was unconscionable or not. *Id.* at 715, 13 Cal.Rptr.3d 88. Fitz argued, much as Hernandez does here, that the court should not judge unconscionability by examining the 2000 amended policy, which removed certain purportedly unconscionable provisions from the 1996 policy, but should instead evaluate unconscionability by looking to the 1996 policy; she asserted this was the proper approach because "a judicial determination of unconscionability focuses on whether the contract or any of its provisions was 'unconscionable at the time it was made.'" *Id.* After noting that "Fitz [had] fail[ed] to provide any authority to support her argument that the 2000 modifications were invalid," such that unconscionability should not be judged with reference to the 2000 amended policy, the court explicitly declined to determine which policy

was relevant because "two provisions . . . that were not modified," i.e., that were present in *both the 1996 and 2000 policies,* were sufficiently unconscionable to make either policy unenforceable. *Id.* ("Fitz, however, fails to provide any authority to support her argument that the 2000 modifications were invalid. At any rate, since we find two provisions of the ACT policy that were not modified to be contra to both standards of unconscionability and the minimum requirements of *Armendariz,* we need not decide whether the 2000 amendments were improper").

*Harper* also does not stand for the proposition that the court must judge unconscionability with reference to the 2001, rather than 2011, DRRP. The Court of Appeal there did not address whether a court can consider validly modifications to a written arbitration agreement when determining unconscionability. Instead, it noted that the agreement was procedurally unconscionable because Ultimo had failed to attach the relevant arbitration rules to the agreement at the time it was presented to the employee to sign. *Harper,* 113 Cal.App.4th at 1406, 7 Cal.Rptr.3d 418 ("Here is the oppression: The inability to receive full relief is artfully hidden by merely referencing the Better Business Bureau arbitration rules, and not attaching those rules to the contract for the customer to review. The customer is forced to go to another source to find out the full import of what he or she is about to sign—and must go to that effort *prior* to signing"). As discussed *infra,* this aspect of *Harper* is distinguishable, as CarMax has adduced evidence that Hernandez was given the DRRP at the time she signed the DRA and when subsequent modifications were made.

Although the *Harper* court referenced the modification provision as additional evidence of procedural unconscionability, *id.* at 1407, 7 Cal.Rptr.3d 418 ("But the oppression is even more onerous than that: As written, the clause pegs both the scope and procedure of the arbitration to rules which might change"), the procedurally unconscionable aspect of the

working after reviewing notice of the modifications or otherwise objected. Accordingly, the DRRP as modified is the applicable agreement").

### (3) Whether the Arbitration Agreement Satisfies the *Cole* Factors [61]

 It is undisputed that the agreement mandates the arbitration of claims based on statutory rights.[62] The court must thus determine whether it satisfies the *Cole* factors before analyzing unconscionability more generally. As noted, these are whether the agreement "(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." See *Cole*, 105 F.3d at 1482; *Armendariz*, 24 Cal.4th at 102, 99 Cal.Rptr.2d 745, 6 P.3d 669.

### (a) Whether the DRRP Provides for Neutral Arbitrators

Rule 5 of the 2011 DRRP governs the selection of a neutral arbitrator.[63] It

states that "CarMax and the Associate shall participate equally in the selection of an Arbitrator to decide the arbitration." [64] It also sets forth a process by which the selection is to occur—the parties are jointly to select an arbitration service, which is then to provide both parties with a list of seven neutral arbitrators having experience in deciding the issues to be arbitrated.[65] Both parties can examine the background information provided regarding the arbitrators and then advise the arbitration service which proposed arbitrators each finds unacceptable. After unacceptable arbitrators are removed from the list, the arbitration service selects an arbitrator from the names remaining as the parties' neutral.[66] As can be seen, the agreement provided for bilateral participation in the selection of an arbitrator, permitting each party to review the credentials of numerous arbitrators and precluding the use of neutrals either considered unacceptable. The final selection was made by a third party with no interest in the proceeding, i.e., the arbitration service. The provision thus satisfies the first *Cole* factor. See, e.g., *Goff v. G2 Secure Staff LLC*, No. CV

---

modification provision, i.e., that "it is unclear whether an arbitration would be conducted under the Better Business Bureau rules at the time of contracting, or at the time of arbitration," *id.* is not present here, because the agreement explicitly provides that the governing DRRP are in effect at the time the claim is brought. Furthermore, nowhere in *Harper* does the court address whether unconscionability should be be judged by looking to a validly modified arbitration agreement not in effect at the time the employee was first employed; the reason for this is likely because the arbitration rules in that case had not been modified.

For these reasons, the court finds *Fitz* and *Harper* distinguishable. The authority cited above for the proposition that unconscionability should be judged by looking to the most recent, validly modified agreement is directly on point and not in conflict with *Fitz* and

*Harper.* Thus, the court applies it to the facts of this case.

**61.** Although CarMax addresses the *Cole* factors in its motion (see MTC at 10–11), Hernandez does not make reference to the factors in her opposition. Instead, she addresses unconscionability more generally.

**62.** Of Hernandez's fifteen causes of action, ten (the first through ninth and twelfth causes of action) expressly invoke statutory rights.

**63.** See Ross Decl., Exh. D ("2011 DRRP") at 9.

**64.** *Id.*

**65.** *Id.*

**66.** *Id.*

12–10008–CAS (VBKx), 2013 WL 1773968, *4 (C.D.Cal. Apr. 22, 2013) ("[T]he Arbitration Agreement in fact does contain provisions that safeguard plaintiff's right to a neutral arbitrator. The Arbitration Agreement provides that 'you and the Company will select an arbitrator' to preside over any dispute. This provision contemplates that selecting an arbitrator is a bilateral process where both the employee and the employer have control over which arbitrator [is] selected. An employee cannot be forced to go before a biased arbitrator chosen unilaterally by his or her employer. In the absence of any fraudulent or oppressive tactics by an employer, allowing both parties to an arbitration agreement to control which arbitrator presides over a dispute is sufficient to ensure the availability of a neutral arbitral forum"); *Dowley v. Dewey Ballantine, LLP,* Civil Action No. 05–622(EGS), 2006 WL 1102768, *5 (D.D.C. Apr. 26, 2006) (concluding that an arbitration agreement provided for a neutral arbitrator, and noting: "Rules 11(a)(ii), (b), and (c)(ii) provide that the prospective arbitrator must not have any interest or relation in the proceedings, must disclose all information that might be relevant to the standards of neutrality as set forth in the rules, and the parties can challenge to disqualify a potential arbitrator").

### (b) Whether the DRRP Provides for More than Minimal Discovery

The second *Cole* factor examines whether the DRRP provides for "more than minimal discovery." Rule 8 requires the parties to make initial disclosures within fourteen days of the appointment of an arbitrator, exchanging copies of "all documents (except for privileged documents that are protected from disclosure because they involve attorney-client, doctor-patient, or other legally privileged or protected communications or materials) upon which they rely in support of their claims or defenses"; it imposes a continuing obligation to supplement the initial disclosures.[67] The 2011 DRRP also provides that each party can propound up to twenty interrogatories and take three oral depositions.[68] Finally, Rule 8(c) gives the arbitrator discretion to permit additional discovery, so long as it is "not overly burdensome, and will not unduly delay conclusion of the arbitration"; to secure additional discovery, the party seeking it must show that there is a "substantial need" for further discovery.[69]

Hernandez asserts, in summary fashion, and without substantive argument, that the discovery authorized by the 2001 Rules[70] is insufficient.[71] Hernandez does not explain why the issues in this case are so difficult and/or complex that the discovery authorized by the DRRP will be insufficient. More fundamentally, although she appears to contend the deposition limitation is unconscionable, she disregards the other types of discovery prescribed, i.e., written interrogatories and initial disclosures, as well as the fact that the arbitrator is vested with discretion to permit additional discovery. As Judge Michael Fitzgerald of this district noted in evaluating the DRRP's discovery provision in *Herrera,* the "substantial need" provision is unlikely to pose a high hurdle if the stated discovery limitations prevent Hernandez from obtaining "a particular docu-

---

67. 2011 DRRP at 9.

68. *Id.* at 9–10.

69. *Id.* at 10.

70. The discovery provisions in the 2001 DRRP are identical to those in the 2011 DRRP. (Compare 2001 DRRP at 14–15 with 2011 DRRP at 9–10.)

71. MTC Opposition at 14.

ment [that] is necessary to [her] ability to prove [her] claims." *Herrera,* 2014 WL 3398363, at *8 ("If a particular document is necessary to Plaintiffs' ability to prove their claims and unavailable to Plaintiffs otherwise, then they have a strong argument for substantial need"). The same is true of additional depositions.

Numerous courts have found that similar—and in some cases, identical—discovery provisions provide sufficient discovery and have held that the DRRP does not unfairly or unconscionably limit a party's ability to conduct discovery in order to prove its case. See, e.g., *Herrera,* 2014 WL 3398363, at *8–9 ("The DRRP's Rule 8 provides for initial disclosure of relevant documents, production of the . . . plaintiff's 'personnel records file,' up to twenty interrogatories which may be submitted with a request for supporting documents, and additional discovery on a showing of 'substantial need.' The court in *Sanchez* [*v. Carmax Auto Superstores California, LLC,* 224 Cal.App.4th 398, 168 Cal.Rptr.3d 473 (2014),*] reviewed the DRRP's Rule 8 and found that it was not unconscionable. . . . Plaintiffs have not shown that the discovery allowable under the DRRP would be unconscionable in wage-and-hour cases. Because the DRRP allows for a significant amount of discovery, because California courts have found it sufficient, and because discovery in arbitration need not be as robust as provided for in a court's rules of procedure, the DRRP's Rule 8 is not unconscionable"); *Jones–Mixon v. Bloomingdale's, Inc.,* No. 14–cv–01103–JCS, 2014 WL 2736020, *9 (N.D.Cal. June 11, 2014) ("The discovery provisions of the agreement in this case require Defendants to provide Plaintiff with 'copies of all documents upon which they rely in support of their claims or defenses,' and Plaintiff is 'entitled to a copy of all documents' in her personnel file. The parties are both limited to one

set of twenty interrogatories and three depositions, and all discovery must be completed within ninety days. In addition, the arbitrator [may] permit additional discovery upon 'a showing of appropriate justification,' so long as the request for discovery is not 'overly burdensome, and will not unduly delay the conclusion of arbitration.' Plaintiff has cited no case in support of her argument that the foregoing discovery restrictions render an agreement to arbitrate substantively unconscionable. The great weight of authority supports at least one California Court of Appeal in holding that '[t]he fact that an arbitration may limit a party's discovery rights is not substantive unconscionability.' In any event, several courts have held that discovery limitations similar to those here do not render an agreement substantively unconscionable" (citations omitted)); *Luchini v. CarMax, Inc.,* No. CV F 12–0417 LJO DLB, 2012 WL 2995483, *10 (E.D.Cal. July 23, 2012) ("CarMax notes that Rule 8 requires the parties' exchange of nonprivileged documents to support claims and defenses and to supplement disclosures and permits up to 20 interrogatories and three depositions along with additional discovery as allowed by the arbitrator. There is no dispute that the arbitration agreement and arbitration rule provide for adequate discovery"); *Abeyrama v. J.P. Morgan Chase Bank,* No. CV 12–00445 DMG (MRWx), 2012 WL 2393063, *4 (C.D.Cal. June 22, 2012) ("Plaintiff also argues that the arbitration agreement does not provide for the minimal discovery that Armendariz requires because the parties can only conduct a limited amount of discovery and two depositions prior to the arbitration hearing. Plaintiff's argument fails because 'the fact that an arbitration may limit a party's discovery rights is not substantive unconscionability.' While the arbitration agreement normally allows only two depositions,

such limitations are generally legal if either party can ask the arbitrator to expand discovery for good cause. Here, the agreement allows for '[e]ither party [to] apply to the arbitrator for further discovery' upon a showing of sufficient cause. Thus, the discovery provision is not substantively unconscionable").[72] The court therefore finds that the 2011 DRRP provides for "more than minimal discovery" and concludes that the second Cole factor is satisfied.

### (c) Whether the DRRP Requires a Written Award

Hernandez argues that the agreement does not require a "written reasoned award"; the provision she references, however, is from the 2001 DRRP.[73] As the court has noted, the 2011 DRRP is the relevant agreement; that agreement *requires a written award*. Specifically, Rule 12 states that "[w]ithin twenty-one calendar days after receipt of any post-hearing briefs, the Arbitrator shall render a decision in the form of a written award and mail to the parties a copy of the written award specifying appropriate remedies." [74] The DRRP permits the arbitrator to issue findings of fact and conclusions of law with the written award. The California Court of Appeal has concluded that the provision "satisfies the minimum requirements for lawful arbitration" under *Armendariz* and California law. See *Sanchez*, 224 Cal. App.4th at 408, 168 Cal.Rptr.3d 473 ("The DRRP requires a written award, and provides: 'In the Arbitrator's discretion, the award may include findings of fact and conclusions of law.' ... The [ ] provision

regarding findings of fact does not prohibit them, but simply leaves it to the discretion of the arbitrator whether to make factual findings. This satisfies the minimum requirements for lawful arbitration of statutory discrimination claims under a mandatory employment arbitration agreement, which include a written award 'that will reveal, however briefly, the essential findings and conclusions on which the award is based,'" citing *Armendariz*, 24 Cal.4th at 107, 99 Cal.Rptr.2d 745, 6 P.3d 669). Cf. *Armendariz*, 24 Cal.4th at 107, 99 Cal.Rptr.2d 745, 6 P.3d 669 (applying the third *Cole* factor and noting: "All we hold today is that in order for such judicial review to be successfully accomplished, an arbitrator in an FEHA case must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based. While such written findings and conclusions are not required under the CAA, nothing in the present arbitration agreement precludes such written findings, and to the extent it applies to FEHA claims the agreement must be interpreted to provide for such findings" (citation omitted)); *Guzman v. Top Finance Co.*, No. B252068, 2015 WL 59146, *7 (Cal.App. Jan. 2, 2015) (Unpub.Disp.) ("The trial court found the absence of a provision requiring a written decision or one referencing discovery rights to be indicative of substantive unconscionability. The absence of these provisions is not overly harsh. Nothing in the arbitration clause precludes a written decision or discovery during the arbitration.... As a result,

---

**72.** See also *Mercuro v. Superior Court*, 96 Cal. App.4th 167, 183–84, 116 Cal.Rptr.2d 671 (2002) (concluding that an arbitration agreement provided for more than "minimal discovery" where it permitted thirty written discovery requests and three depositions, and noting that " 'adequate' discovery does not mean unfettered discovery and *Armendariz* it-

self recognizes an arbitration agreement may require 'something *less than* the full panoply of discovery provided in [the California Code of Civil Procedure").

**73.** MTC Opposition at 12.

**74.** See 2011 DRRP at 12.

'the absence of express provisions requiring a written arbitration award and allowing discovery does not render the arbitration agreement unconscionable. Rather, those terms are implied as a matter of law as part of the agreement'" (citation omitted)); *Sanchez v. Western Pizza Enterprises, Inc.,* 172 Cal.App.4th 154, 177, 90 Cal.Rptr.3d 818 (2009) ("[W]e conclude that the absence of express provisions requiring a written arbitration award and allowing discovery does not render the arbitration unconscionable. Rather, those terms are implied as a matter of law as part of the agreement"). The court thus finds that the DRRP's written award provision satisfies the third *Cole* factor.

### (d) Whether the DRRP Provides for All Types of Relief That Would Be Available in a Court Proceeding

Rule 14 of the DRRP states that "[i]f the Arbitrator finds for the Associate, the Arbitrator, in his discretion, *may award appropriate relief in accordance with applicable law.*" [75] Thus, the 2011 DRRP expressly authorizes an award of all types of relief that could be obtained if the action were litigated in court. This factor is thus satisfied. See *Arreguin,* 2008 WL 4104340, at *7 ("[T]he agreement expressly states that all of the types of relief that would otherwise be available in court, 'including such equitable and extraordinary remedies as temporary and permanent injunctive relief,' are available in arbitration").

### (e) Whether the DRRP Does Not Condition Access to the Arbitral Forum on Payment of Unreasonable Costs

Hernandez argues that the DRRP conditions access to the arbitral forum on payment of unreasonable costs by the employee because it "require[s] the employee

to pay certain of the arbitration forum fees (including room rental), and also permits these fees to be shifted and awarded to CarMax if CarMax[ ] prevails." [76] Hernandez once again focuses on the 2001 rather than the 2011 DRRP. Although the 2001 DRRP might have required that an employee bear some of the costs of the arbitration, the 2011 DRRP has no similar provision. Rather, Rule 13 requires that CarMax pay all fees associated with the arbitration, including "filing or administrative fees charged by the Arbitration Service, hourly fees charged by the Arbitrator, and expenses of renting a room in which the arbitration is held." [77] The court thus concludes that the fifth and final *Cole* factor is satisfied.

### (f) Conclusion Re: *Cole* Factors

For the reasons stated, the court finds that the 2011 DRRP between CarMax and Hernandez satisfies each of the *Cole* factors. Accordingly, the court proceeds to consider whether it is unconscionable generally.

### (4) Whether the Arbitration Agreement is Procedurally Unconscionable

"Procedural unconscionability concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. It focuses on factors of oppression and surprise. The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." *Parada v. Superior Court,* 176 Cal.App.4th 1554, 1570, 98 Cal.Rptr.3d 743 (2009) (citations omitted).

---

**75.** 2011 DRRP at 13 (emphasis added).

**76.** MTC Opposition at 12.

**77.** 2011 DRRP at 12–13.

██ Hernandez argues first that the DRRP is a procedurally unconscionable contract of adhesion because consent to arbitration was a "condition of [her] employment" and she was not given a sufficient explanation of "the advantages and disadvantages of arbitration," or told that she could "opt out" of the agreement or negotiate its terms.[78] The court agrees that the adhesive nature of the agreement demonstrates that the DRRP is procedurally unconscionable, at least to some degree.

In *Armendariz,* the California Supreme Court concluded that an arbitration agreement was procedurally unconscionable because "[i]t was imposed on employees as a condition of employment and there was no opportunity to negotiate...." *Armendariz,* 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669. The Court noted that "in the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." *Id.* Because the agreement lacked mutuality, it concluded that the arbitration agreement was substantively as well as procedurally unconscionable. Specifically, the employee was required to arbitrate claims against the employer, but the employer was not bound to arbitrate any dispute it had with the employee. *Id.* at 114, 119, 99 Cal.Rptr.2d 745, 6 P.3d 669. The Court noted that, in the employment context, arbitration agreements must contain a "modicum of bilaterality." *Id.* at 117, 99 Cal.Rptr.2d 745, 6 P.3d 669. It explained:

"Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is

unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities.' As has been recognized 'unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it.' ... If the arbitration system established by the employer is indeed fair, then the employer as well as the employee should be willing to submit claims to arbitration. Without reasonable justification for this lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose." *Id.* at 117–18, 99 Cal.Rptr.2d 745, 6 P.3d 669 (citations omitted).

Like the arbitration agreement at issue in *Armendariz,* CarMax's arbitration agreement is procedurally unconscionable. Although it is not hidden, or buried in a lengthy document, see *Nat'l Bank of California, NA v. Gay,* No. CV 11–2521–RSWL (JCGx), 2011 WL 2672359, *3 (C.D.Cal. June 29, 2011) ("[T]he element of surprise was not present at the time of contracting. The arbitration agreement is not hidden or difficult to read, as it was contained in a stand-alone, three-page document regarding remedies, is listed in bold, capital letters and clearly sets forth the terms contained therein"), it is a preemployment contract of adhesion that the potential employee must sign if he or she wishes to be considered for employment. Indeed, the document speaks for itself in this regard; its first sentence states that the employer "will not consider

---

78. MTC Opposition at 8–11.

[the employee's] application unless [the employee] consents to be bound by [the attached] arbitration policy."[79] Consequently, not only was acceptance of the clause a condition of employment, it was a condition of being considered for employment. A prospective employee such as Hernandez thus has no meaningful opportunity to negotiate its terms. See *Circuit City Stores,* 279 F.3d at 893 (holding that an agreement was procedurally unconscionable because "job applicants [were] not permitted to modify the agreement's terms—they [had to] take the contract or leave it"); see also *Armendariz,* 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (holding that an arbitration agreement was procedurally unconscionable because it "was imposed on employees as a condition of employment and there was no opportunity to negotiate . . ."); *Abramson v. Juniper Networks, Inc.,* 115 Cal.App.4th 638, 663, 9 Cal.Rptr.3d 422 (2004) ("We next consider the 'absence of real negotiation or a meaningful choice on the part of the weaker party.' In other words, was the arbitration clause presented on a take it or leave it basis? According to plaintiff's uncontroverted declaration, he 'was not permitted to negotiate the terms of the Offer Letter or the Employment Agreement, but was given to understand that all Juniper employees were required to sign these documents as a condition of employment.' Significantly, defendants offered no evidence to the contrary. Furthermore, the contract itself corroborates plaintiff's understanding that no negotiation concerning arbitration was possible, since it contains a provision requiring his acknowledgment that he was 'offered employment in consideration of [his] promise to arbitrate claims' "); *O'Hare v. Municipal Resource Consultants,* 107 Cal.App.4th 267, 284, 132

Cal.Rptr.2d 116 (2003) ("In this case, the 1991 employment contract begins: 'Confirming our recent conversation, this Agreement sets forth the terms of your employment.' The typed eight-page document appears to be a boilerplate contract given to all employees who have access to confidential information. It contains multiple generic provisions. The only portion filled in by hand is O'Hare's salary: $50,000 a year. Nothing in this document suggests it was the product of 'give and take.' In fact, the arbitration provision is so one-sided it defies credulity to suggest either [that] O'Hare had any input on that issue or [that] any expressed desire to change its terms would have been considered or honored. In sum, it is reasonable to infer procedural unconscionability").

Hernandez contends that, beyond the adhesive nature of the agreement, the fact that CarMax did not give her a copy of the DRRP before she signed the DRA adds an additional layer of procedural unconscionability. She notes that courts have concluded that "[t]he failure to attach the applicable rules referred to in the agreement, or provide them to employee at the time the agreement is entered into establishes further procedural unconscionability."[80] California courts have found agreements procedurally unconscionable if they fail to attach the rules pursuant to which the arbitration will be conducted. See, e.g., *Trivedi v. Curexo Technology Corp.,* 189 Cal.App.4th 387, 393, 116 Cal.Rptr.3d 804 (2010) (holding that failure to attach the AAA arbitration rules weighed in favor of a finding of procedural unconscionability); *Fitz v. NCR Corp.,* 118 Cal.App.4th 702, 721, 13 Cal.Rptr.3d 88 (2004) (holding that an arbitration agreement

---

**79.** Greene Decl., Exh. 1.

**80.** MTC Opposition at 8–9 (citing *Harper v. Ultimo,* 113 Cal.App.4th 1402, 1402, 7 Cal.Rptr.3d 418 (2003)).

was procedurally unconscionable because it did not attach the AAA rules); *Gutierrez v. Autowest, Inc.*, 114 Cal.App.4th 77, 84, 89, 7 Cal.Rptr.3d 267 (2003) (stating that plaintiff was "never given or shown a copy of the arbitration rules of the American Arbitration Association (AAA), the designated arbitration provider"); *Harper v. Ultimo*, 113 Cal.App.4th 1402, 1405, 7 Cal.Rptr.3d 418 (2003) (declining to enforce an arbitration clause that incorporated by reference, but failed to attach, the rules of the Better Business Bureau); *Patterson v. ITT Consumer Financial Corp.*, 14 Cal.App.4th 1659, 1665, 18 Cal.Rptr.2d 563 (1993) (noting that, at signing, "borrowers were not given a copy of the procedural rules of the National Arbitration Forum (NAF); the rules were sent to the borrowers only once ITT had initiated a claim against them"); see also *Dunham v. Environmental Chemmical Corp.*, No. C 06–03389 JSW, 2006 WL 2374703, *11 (N.D.Cal. Aug. 16, 2006) ("Here, as in *Fitz* and *Harper*, though the AAA rules were referenced in the Arbitration Agreement, the rules themselves were never provided to Dunham.... As such, relying on *Harper* and *Fitz*, this Court finds that failure to attach the referenced AAA rules was procedurally unconscionable").

Evidence in the record, however, belies Hernandez's assertion that she was not given the DRRP at the time she entered into the agreement, and that she was not given sufficient notice and access to the 2011 DRRP when modifications were made. Although Hernandez asserts that the employment application she completed did not include the DRRP,[81] the application, on its face, and in bold text, states to the contrary:

"If you wish to be considered for employment you must read and sign the following agreement. You will be considered as an applicant when you have signed the Agreement. *Included with this application is the CarMax Dispute Resolution Rules and Procedures.* You should familiarize yourself with these rules and procedures prior to signing the Agreement. *If the Rules and Procedures are not included in this booklet, you must request a copy from a CarMax representative prior to signing the Agreement.* You will note that if you sign at this time you do have three (3) days to withdraw your consent. You may, of course, take the package with you and return with it signed, if you wish to continue your application process."[82]

Hernandez does not dispute that she signed the employment application and subsequent agreements acknowledging, immediately below bolded text, that she had "received" a copy of the DRRP prior to signing the agreement.[83] Although Hernandez now asserts this representation was not true, and that she did not receive a copy of the DRRP before she signed the employment application, she states only that she was not given a copy of the DRRP, not that she requested a copy of the DRRP and one was not provided.[84] As

---

81. See Declaration of Rosella Michelle Hernandez in Support of Opposition to Motion to Compel Arbitration ("Hernandez Decl."), Docket No. 15–1 (Mar. 9, 2015), ¶ 5.

82. Ross Decl., Exh. A at 7 (italics added).

83. *Id.*, Exh. A at 8 ("**The Dispute Resolution Agreement and the Dispute Resolution Rules and Procedures affect your legal rights.** *By*

*signing this Agreement, you acknowledge receipt of the Dispute Resolution Rules and Procedures.* **You may wish to seek legal advice before signing this Dispute Resolution Agreement**," (italics added)).

84. Hernandez Decl., ¶ 5 ("The 2001 Rules were not provide[d] to me at the time I completed my application, nor were they offered to me, nor were they provided to me at any

the notice on the employment application makes clear, an applicant had an obligation, if the DRRP was not included with the application, to "request a copy from a CarMax representative prior to signing the Agreement." There is no evidence that she did so. Moreover, her current assertions are fundamentally inconsistent with her signature on the employment application.

As for subsequent DRRPs, including the 2011 DRRP, the agreement, as noted, requires that CarMax give employees notice of the modified DRRP. CarMax has submitted Ross' declaration, which states that CarMax employees, including Hernandez, were given access to copies of all DRRPs through the company's intranet system.[85] Ross notes, moreover, that management assistants, like Hernandez, received copies of the modified DRRPs via email prior to the effective date of the modifications.[86] Given this evidence, the court cannot find that CarMax failed to give Hernandez (or make available to her) a copy of the relevant arbitration rules before the time she signed the DRA. Nor can it find that CarMax failed to give with notice and copies of the modified DRRPs as required by the

agreement. Thus, the court concludes that the DRRP is not procedurally unconscionable because CarMax failed to attach the relevant DRRP to the agreement or otherwise make it available. See, e.g., *Herrera*, 2014 WL 3398363 at *6 ("Plaintiffs argue that '[t]he degree of procedural unconscionability here is multiplied by the fact that at the time they signed these agreements, none of the Plaintiffs were provided the 2011 DRRP Defendant seeks to enforce, nor is there any evidence they were provided with Defendant's DRRP.' As discussed above, the Court finds that the 2011 DRRP is the operative version, as older versions were modified pursuant to the DRRP's Rule 19. As to whether Plaintiffs 'were provided with Defendant's DRRP' the Agreements provide that if the DRRP is not within the application packet, the applicant should request the DRRP from a CarMax representative. Moreover, Plaintiffs signed under the Agreements' bold text specifically acknowledging that they had received the DRRP. The Court finds that the Agreement has a small degree of procedural unconscionability resulting from its adhesive nature").[87]

---

time before I was hired, nor did anybody even tell me where I could get the rules so I could see what they said. Nobody reviewed or discussed the 2001 Rules or any of its provisions with me or told me that agreeing to the 2001 Rules was option, or that any of the terms were negotiable").

**85.** Ross Decl., ¶ 4. Thus, although Hernandez argues that "there is no evidence submitted that the 2001 Rules (or any of CarMax's arbitration rules) are available on the internet," CarMax has submitted evidence demonstrating that CarMax employees, including Hernandez, had ready access to the DRRPs.

**86.** *Id.*, ¶ 4; *id.*, Exh. G.

**87.** Hernandez notes, in passing, that "CarMax did not ... provide the[ ] [2001 Rules] to her before she was hired." (MTC Opposition at 10.) She also states, in her declaration,

that she had been hired by CarMax prior to being required to complete an employment application and to sign the DRA. (Hernandez Decl., ¶ 3.) Although she does not explicitly make the argument in her memorandum, it appears that she contends that this timeline of events added an additional degree of procedural unconscionability because she would have been required to "quit" her job with CarMax if she refused to sign the DRA given the fact that the agreement was mandatory and she was not asked to sign it until after she had purportedly been hired.

The court is not persuaded that this demonstrates procedural unconscionability. First, CarMax has presented evidence from its Human Resources department indicating that Hernandez had not been hired until July 8, 2002, some twelve days after she was presented with and signed the DRA. (See Declaration of Kristy P. Jordan In Support of Petitioner

Finally, Hernandez contends that the agreement is procedurally unconscionable because the DRRP contains a modification provision.[88] She relies on *Poublon v. Robinson Co.*, No. 2:12–cv–06654–CAS (MANx), 2015 WL 588515, *1 (C.D.Cal. Jan. 12, 2015). In *Poublon*, Judge Christina Snyder of this district concluded that a unilateral modification provision "add[ed] an additional element of surprise" and procedural unconscionability because "defendants ... pointed to no contractual limitation on defendants' ability to unilaterally modify the Arbitration Procedures on the company intranet." *Poublon*, 2015 WL 588515 at *5. In so concluding, Judge Snyder distinguished *Casas*, noting that the DRRP's modification clause, unlike the one at issue in *Poublon*, "provided a specific date for any amendment ... 30 days' notice, and posting at the employer's place of business." *Id.*

*Poublon* is distinguishable, and in fact supports CarMax's contention that the modification provision is not unconscionable. That provision is, in all relevant respects, identical to the one at issue in *Casas*. Judge Snyder implicitly recognized that the *Casas* provision was not procedurally unconscionable. Hernandez does not dispute that the agreement required that CarMax give all employees notice of any intention to amend the DRRP at least thirty days before the modification took effect. She has adduced no evidence that the notice was not given.

---

CarMax's Opposition to Motion to Dismiss Petition to Compel Arbitration, Docket No. 17–1 (Mar. 16, 2015), ¶ 2; *id.*, Exh. G; Declaration of Steven A. Weiss in Support of Petitioner CarMax's Reply to Respondent's Opposition to Motion to Compel Arbitration and Stay State Court Action, Docket No. 17–3 (Mar. 16, 2015), ¶ 2; *id.*, Exh. H.)

More fundamentally, even if Hernandez had not been presented with the DRA until after she was officially hired by CarMax—which the evidence indicates is not the case—courts have found that "the exact date that [an employee] began to work for CarMax is not alone determinative of whether [she] showed oppression or surprise," particularly in cases where, as here, "[t]he stand-alone arbitration agreement was not hidden, but prominently featured as part of the employment application." *Sanchez*, 224 Cal.App.4th at 402–03, 168 Cal.Rptr.3d 473 ("Sanchez makes much of the timing of his signature, arguing that he was not advised that he would have to sign an arbitration agreement until after he was already working for CarMax. He submitted a declaration in the trial court stating that he began work for CarMax on October 16, 2006 without being told that he would have to sign an arbitration agreement, and was presented with the agreement for signature over a week later on October 26. His declaration also states, however, that he received his offer of employment from CarMax on October 31, 2006, and he acknowl-

edged receipt of the Associate Handbook on November 9, 2006. The October 31, 2006 letter offering him employment states that he was to start October 16 (which CarMax calls a typographical error); his signature on the letter accepting and agreeing to the offer of employment is dated November 9, 2006. He acknowledged receipt of the CarMax Associate Handbook on November 9 and November 21, 2006. Further, Sanchez signed his employment application on October 26. The trial court did not resolve the factual question whether Sanchez signed the agreement before or after he began employment with CarMax. In any event, the exact date that Sanchez began to work for CarMax is not alone determinative of whether he showed oppression or surprise. The trial court did not find oppression or surprise, and we agree. The stand-alone arbitration agreement was not hidden, but prominently featured as part of the employment application, and there are no 'other indicia of procedural unconscionability' " (citation omitted)); see also *Luchini v. Carmax, Inc.*, No. CV F 12–0417 LJO DLB, 2012 WL 2995483, *9 (E.D.Cal. July 23, 2012) (finding no oppression or surprise when employee signed arbitration agreement after beginning employment with CarMax).

**88.** MTC Opposition at 10–11 ("Further, the fact that CarMax alone may modify or even terminate the Agreement adds to the procedural unconscionability and unfair surprise").

Given undisputed evidence that CarMax complied with Rule 19's notice requirements and gave all employees, including Hernandez, at least thirty days' notice and a copy of proposed modifications to the agreement,[89] the court cannot find that the modification clause is procedurally unconscionable or results in "unfair surprise" as in *Poublon*.[90]

**89.** See Ross Decl., ¶¶ 3–4; *id.*, Exh. G.

**90.** The court's conclusion that the modification clause is not procedurally unconscionable is consistent with the decisions of at least two other courts that have considered the same provision. See, e.g., *Herrera*, 2014 WL 3398363 at *4 ("Plaintiffs argue that th[e] [modification] term renders the agreement illusory because it permits CarMax to unilaterally modify its terms. The California Court of Appeal held in *Casas v. Carmax Auto Superstores California LLC* that 'the modification clause in the CarMax DRRP does not invalidate the arbitration agreement.' The court found that the DRRP's Rule 19 did not render the agreement illusory because modifications could only be made with advance notice, implying a covenant of good faith and fair dealing. The implied covenant 'limit[ed] the employer's authority to unilaterally modify the arbitration agreement and save[d] that agreement from being illusory and thus unconscionable.' ... The modification term in the 1999 DRRP is identical in all relevant respects to the term discussed in *Casas* above. Therefore, the Agreements are not illusory" (citations omitted)); *id.* at *7 ("Plaintiffs contend that the Agreements are [ ] unconscionable 'because they provide for the unilateral after the fact modifications only by the Plaintiffs' employer.' But as discussed above, CarMax's freedom under the Agreements to unilaterally modify the contract] terms is limited by an implied covenant of good faith and fair dealing. That implied covenant 'saves the agreement from being illusory and thus unconscionable'" (citations omitted)); *Casas*, 224 Cal.App.4th at 1236–37, 169 Cal.Rptr.3d 96 ("Unlike the arbitration clause in *Sparks*, the arbitration agreement in this case was not hidden in a handbook which the employee simply acknowledged receiving. More to the point, the agreement signed by Casas provided a specific date for any amendment of the agreement or the DRRP (December 31 of every year), 30 days' notice, and posting at CarMax locations, while the clause in the handbook in *Sparks* allowed change or elimination without notice, and at any time. While the trial court did not find the modification provision unconscionable, it declared it unilateral, allowing CarMax to 'change [its] mind' about the arbitration agreement but not allowing Casas to change his mind. Under California law, however, even a modification clause not providing for advance notice does not render an agreement illusory, because the agreement also contains an implied covenant of good faith and fair dealing. 'Where the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair dealings.' '[T]he implied covenant of good faith and fair dealing limits the employer's authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable,'" citing *Serpa v. California Surety Investigations, Inc.*, 215 Cal.App.4th 695, 708, 155 Cal.Rptr.3d 506 (2013)); *id.* at 1237, 169 Cal.Rptr.3d 96 ("Casas points out that rule 19 of the DRRP also provides: '[A]ll claims arising before alteration or termination shall be subject to the [agreement] in effect at the time the Arbitration Request Form is received by the Company.' To the extent that this express statement would subject a claim to a modified agreement where the claim arose before a modification, but was not submitted to arbitration until after incorporation of that modification into the arbitration agreement, the covenant of good faith and fair dealing cannot vary the plain language, and the contract is illusory. In this case, however, rule 18 of the DRRP states that if any of the arbitration rules 'is held to be in conflict with a mandatory provision of applicable law, the conflicting Rule or Procedure shall be modified automatically to comply with the mandatory provision' until the rules can be formally modified to comply with the law. That express statement in rule 18 means that should an employee assert a claim that arose before modification of the agreement, CarMax could not apply the modifications to that claim. The modification clause in the CarMax DRRP does not invalidate the arbitration agreement" (citations omitted)). See also *24 Hour Fitness, Inc. v. Superior*

Because the arbitration agreement was presented on a take it or leave basis, and because prospective employees had to sign it as a condition of being considered for employment, however, the arbitration agreement between Hernandez and Car-Max is procedurally unconscionable to some degree. See, e.g., *Herrera*, 2014 WL 3398363 at *6 ("The Court finds that the Agreement has a small degree of procedural unconscionability resulting from its 'adhesive nature'" (citation omitted)); *Sanchez*, 224 Cal.App.4th at 403, 168 Cal. Rptr.3d 473 ("The arbitration agreement was presented to Sanchez on a take-it-or-leave-it basis, and his signature was a precondition for employment with Car-Max. It was therefore a standard contract of adhesion imposed and drafted by CarMax, who had superior bargaining power.... As Sanchez had no real choice whether to sign, the agreement was procedurally unconscionable. The trial court recognized, however, [that the fact] '[t]hat the agreement is required does not make it unenforceable, absent other factors.' ... The trial court did not find oppression or surprise, and we agree. The stand-alone arbitration agreement was not hidden, but prominently featured as part of the employment application, and there are no 'other indicia of procedural unconscionability.' The adhesive nature of the agreement[, however,] is evidence of some degree of procedural unconscionability," citing *Ajamian v. Can-*

*torCO2e, L.P.*, 203 Cal.App.4th 771, 797, 137 Cal.Rptr.3d 773 (2012)).

**(5) Whether the Arbitration Agreement is Substantively Unconscionable**

■■■ The foregoing analysis indicates that the arbitration agreement was somewhat unconscionable procedurally. Cf. *Nagrampa*, 469 F.3d at 1284 (holding that there was only "minimal" procedural unconscionability despite defendant's "overwhelming bargaining power," its concession that the contract was non-negotiable, and its drafting of the contract). Consequently, the court can find that it is unenforceable only on a showing of significant substantive unconscionability. See, e.g., *id.* at 1281 ("Because California courts employ a sliding scale in analyzing whether the entire arbitration provision is unconscionable, even if the evidence of procedural unconscionability is slight, strong evidence of substantive unconscionability will tip the scale and render the arbitration provision unconscionable," citing *Armendariz* ).

■■■ An arbitration provision is substantively unconscionable if it is " 'overly harsh' " or generates " 'one-sided' results." *Armendariz*, 24 Cal.4th at 114, 99 Cal. Rptr.2d 745, 6 P.3d 669 (quoting *A & M Produce*, 135 Cal.App.3d at 486–87, 186 Cal.Rptr. 114); see *Herrera*, 2014 WL 3398363 at *6 (" 'Substantive unconscionability relates to the effect of the contract

Court, 66 Cal.App.4th 1199, 1214, 78 Cal. Rptr.2d 533 (1998) (*"James G. Freeman & Associates, Inc. v. Tanner* is instructive. The contract there permitted one party to amend the terms at will upon thirty days' written notice. The court squarely rejected the notion that this power rendered the contract illusory: '[W]here the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair deal-

ings.' Nautilus's discretionary power to modify the terms of the personnel handbook in writing indisputably carries with it the duty to exercise that right fairly and in good faith. So construed, the modification provision does not render the contract illusory," citing *Powell v. Central Cal. Fed. Sav. & Loan Ass'n*, 59 Cal.App.3d 540, 549, 130 Cal.Rptr. 635 (1976); *James G. Freeman & Associates, Inc. v. Tanner*, 56 Cal.App.3d 1, 8, 10, 128 Cal. Rptr. 109 (1976); *Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 357–58, 6 Cal. Rptr. 31 (1960)).

or provision ... focus[ing] on the terms of the agreement and whether those terms are so one-sided as to shock the conscience,'" quoting *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043 (9th Cir. 2001)). "California law requires an arbitration agreement to have a 'modicum of bilaterality,' and arbitration provisions that are 'unfairly one-sided' are substantively unconscionable." *Merkin v. Vonage America Inc.*, No. 2:13–cv–08026–CAS (MRWx), 2014 WL 457942, *9 (C.D.Cal. Feb. 3, 2014) (citing *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071, 130 Cal.Rptr.2d 892, 63 P.3d 979 (2003); *Armendariz*, 24 Cal.4th at 117, 99 Cal.Rptr.2d 745, 6 P.3d 669).

### (a) Statute of Limitations

Hernandez first argues that the DRRP is substantively unconscionable because it shortens the limitations period on statutory claims against CarMax and because the limitations provision is unilateral, i.e., it applies only to her claims against CarMax and does not apply to claims asserted by CarMax.[91] California courts have found arbitration agreements that shorten the limitations period for statutory claims substantively unconscionable. See, e.g., *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App.4th 1267, 1283, 16 Cal.Rptr.3d 296 (2004). *Nyulassy* does not assert Hernandez here, however, because the relevant DRRP does not include a unilateral provision that shortens the statute of limitations on an employee's statutory claims.

Although Rule 4(b) of the 2001 DRRP required that an employee submit an arbi-

tration claim "not later than one year after the date on which [he or she] knew, or through reasonable diligence, should have known, of the facts giving rise to the ... claim(s)",[92] the 2011 DRRP includes no such limitation. Instead, it requires that an arbitration request form be submitted "no later than the applicable statute of limitations for the asserted claims under the applicable law."[93] Because the 2011 DRRP applies, Hernandez's argument that it unconscionably shortens the limitations period on her claims is unavailing.

### (b) Written Arbitration Decision

Hernandez next argues that the DRRP is substantively unconscionable because it does not require a written arbitration award.[94] As discussed, however, this argument likewise focuses on the 2001 DRRP. The 2011 DRRP requires that the arbitrator issue a written arbitration award and gives him or her discretion to support the award with findings of fact and conclusions of law.[95] These requirements are sufficient to ensure adequate judicial review of any award, should the need arise. The court thus concludes the DRRP's award provision is not substantively unconscionable. See *Sanchez*, 224 Cal.App.4th at 408, 168 Cal.Rptr.3d 473 ("The DRRP requires a written award, and provides: 'In the Arbitrator's discretion, the award may include findings of fact and conclusions of law.' ... The [ ] provision regarding findings of fact does not prohibit them, but simply leaves it to the discretion of the arbitrator whether to make factual findings. This satisfies the minimum require-

---

**91.** MTC Opposition at 11–12.

**92.** See 2001 DRRP at 13.

**93.** See 2011 DRRP at 8.

**94.** MTC Opposition at 12 ("*Armendariz* requires a written arbitration award with adequate judicial review. To ensure adequate

judicial review, 'an arbitrator in a FEHA case must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based").

**95.** See 2011 DRRP at 12.

ments for lawful arbitration"). Cf. *Armendariz*, 24 Cal.4th at 107, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("[N]othing in the present arbitration agreement precludes such written findings, and to the extent it applies to FEHA claims the agreement must be interpreted to provide for such findings" (citation omitted)); *Guzman*, 2015 WL 59146 at *7 ("The trial court found the absence of a provision requiring a written decision or one referencing discovery rights to be indicative of substantive unconscionability. The absence of these provisions is not overly harsh. Nothing in the arbitration clause precludes a written decision or discovery during the arbitration.... As a result, 'the absence of express provisions requiring a written arbitration award and allowing discovery does not render the arbitration agreement unconscionable. Rather, those terms are implied as a matter of law as part of the agreement,'" citing *Western Pizza Enterprises, Inc.*, 172 Cal.App.4th at 177, 90 Cal.Rptr.3d 818).

### (c) Costs Provision

Hernandez's next argument—that the agreement is substantively unconscionable because it does not require CarMax to bear all of the costs of arbitration—is unpersuasive for the same reason, i.e., that it is premised on the language of the 2001, rather than the 2011, DRRP.[96] The 2011 DRRP requires that CarMax bear all arbitration costs. The court therefore concludes that the costs provision is not substantively unconscionable.

### (d) Confidentiality Provision

Rule 9(g) of the 2011 DRRP states:

"All aspects of an arbitration pursuant to these Dispute Resolution Rules and Procedures, including the hearing and record of the proceeding, shall be confidential and shall not be open to the public, except (I) to the extent both Parties agree otherwise in writing; (ii) as may be appropriate in any subsequent proceeding between the Parties; or (iii) as may otherwise be appropriate in response to a governmental agency or legal process. All settlement negotiations, mediations, and the results thereof shall be confidential." [97]

■ Hernandez argues that "the requirement of confidentiality of the arbitration proceedings is unconscionable because, although it is facially mutual, in reality it may greatly favor the employer because [it is a] 'repeat player[ ].'" [98] In support of this argument, Hernandez cites two Ninth Circuit cases—*Ting*, 319 F.3d at 1151–52 and *Davis*, 485 F.3d at 1078–79. She contends that in these cases, the Ninth Circuit noted that an arbitration provision that required confidentiality might be unconscionable if it had the effect of permitting the employer—as a "repeat player" in multiple arbitrations with separate employees—to use knowledge gained from prior arbitrations while denying a similar advantage to employees. See *Ting*, 319 F.3d at 1151–52 ("[C]onfidentiality provisions usually favor companies over individuals. In *Cole*, the D.C. Circuit recognized that because companies continually arbitrate the same claims, the arbitration process tends to favor the company. Yet because of plaintiffs' lawyers and arbitration appointing agencies like the [American Arbitration Association], who can scrutinize arbitration awards and accumulate a body of knowledge on a particular company, the court discounted the likelihood of any harm occurring from the 'repeat player' effect. We conclude, however, that if the company succeeds in imposing a

**96.** MTC Opposition at 12.

**97.** 2011 DRRP at 11.

**98.** MTC Opposition at 13.

gag order, plaintiffs are unable to mitigate the advantages inherent in being a repeat player. This is particularly harmful here, because the contract at issue affects seven million Californians"); *id.* ("Thus, [the employer] has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, [the employer] accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. Further, the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination against [the employer]"); see also *Davis,* 485 F.3d at 1078 (citing *Ting* ). The court is not persuaded for several reasons.

First, as CarMax notes, both the *Sanchez* and *Herrera* courts concluded that the confidentiality provision in the 2011 DRRP was not substantively unconscionable. Those courts considered the nature of the provision and concluded that it was not enough, standing alone, to warrant a finding of substantive unconscionability. See *Herrera,* 2014 WL 3398363 at *9 ("The DRRP's Rule 9.g provides that all aspects of the arbitration 'shall be confidential and shall not be open to the public.' Plaintiffs contend that this provision is substantively unconscionable because 'it prevents Plaintiffs from discussing their claims with other potential plaintiffs and from discovering relevant precedent to support their claims.' The court in *Sanchez* found there was 'nothing unreasonable or prejudicial' about Rule 9.g or with respect to its 'fairness or desirability.' It therefore found that Rule 9.g was not unconscionable"); *Sanchez,* 224 Cal.App.4th at 408, 168 Cal.Rptr.3d 473 ("The second provision requiring confidentiality is not unconscionable. In regard to 'the fairness or desirability of a secrecy provision with respect to the par-

ties themselves, ... we see nothing unreasonable or prejudicial about it,' and it is not substantively unconscionable," citing *Woodside Homes of Cal., Inc. v. Superior Court,* 107 Cal.App.4th 723, 732, 132 Cal. Rptr.2d 35 (2003)).

Second, and more fundamentally, the Ninth Circuit has noted that "the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general." *Kilgore v. KeyBank Nat'l Ass'n,* 718 F.3d 1052, 1059 n. 9 (9th Cir.2013) ("In any event, the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general. Plaintiffs are free to argue during arbitration that the confidentiality clause is not enforceable"). Hernandez argues that the confidentiality provision is unduly restrictive and provides a "repeat player [like CarMax an] advantage" because it allows it to use prior arbitral rulings concerning other employees, while depriving the employee of the ability to do so, even if he or she is represented by a lawyer involved in the prior proceeding. Even if this were so, under *Kilgore,* the fact that a confidentiality clause is overly restrictive and not enforceable does not compel a conclusion that the arbitration agreement itself is unenforceable; indeed, the *Kilgore* court suggested that this argument is best left to the arbitrator to decide. See, e.g., *Melez v. Kaiser Foundation Hospitals, Inc.,* No. 2:14–cv–08772–CAS (VBKx), 2015 WL 898455, *11 (C.D.Cal. Mar. 2, 2015) ("The DROP confidentiality provision is less restrictive than those held unconscionable in the cases cited above.... Moreover, even assuming the provision is unduly restrictive, the Ninth Circuit has cautioned against invalidating arbitration agreements on the basis of confidentiality provisions, noting that '[p]laintiffs are free to argue during arbitration that the confiden-

tiality clause is not enforceable.' For these reasons, the Court does not find the confidentiality provision at issue to render the arbitration agreement unconscionable" (citations omitted)); *Herrera*, 2014 WL 3398363 at *9–10 ("Ordinarily, when a contract contains an arbitration clause, questions of interpretation of the contract and enforceability of particular provisions are left for the arbitrator. Unless the arbitration clause itself is unenforceable, the question whether a particular provision of the contract, like the confidentiality clause, is unenforceable is thus left to the arbitrator. Courts have hesitated to invalidate arbitration agreements entirely on a speculative risk that arbitration might subject a plaintiff to an unfair result. Likewise, here, the risk that Rule 9.g. might be interpreted in an unconscionable is insufficient to invalidate the arbitration clause itself. Both California courts and the Ninth Circuit have agreed that the risk of repeat-player advantage does not render unenforceable an arbitration agreement containing a confidentiality clause. The potentially unconscionable interpretation of the confidentiality provision does not so permeate the arbitration agreement as to render it unenforceable. The question whether the agreement bars multiple representations must be presented to the arbitrator, subject to the opportunities for review available in the FAA" (citations omitted)); *Velazquez v. Sears, Roebuck and Co.*, No. 13cv680–WQH–DHB, 2013 WL 4525581, *5 (S.D.Cal. Aug. 26, 2013) ("Plaintiff contends that [a] confidentiality provision [in the arbitration agreement] is substantively unconscionable because the proposed class consists of over 10,000 employees, and 'the confidentiality provision prevents other employee-plaintiffs from accessing precedent while allowing Defendant to gain the advantages of being a 'repeat player' in wage and hour arbitrations.' The Court of Appeals for the Ninth Circuit has 'found confidentiality provisions to be substantively unconscionable when applied to a large class of customers.' However, [it] most recently has stated that 'the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general. Plaintiffs are free to argue during arbitration that the confidentiality clause is not enforceable.' Moreover, the California Court of Appeal has found that a nearly identical clause does not render an arbitration agreement unenforceable. The Court finds that the confidentiality provision does not render the Agreement substantively unconscionable. Plaintiff is 'free to argue during arbitration that the confidentiality clause is not enforceable,' " citing *Kilgore* ).

Because confidentiality provisions are generally unobjectionable and, in any event, "the enforceability of the confidentiality clause is a matter distinct from the confidentiality of the arbitration clause in general"—the question now before the court—the court concludes that Rule 9(g) of the 2011 DRRP does not render the DRRP substantively unconscionable and thus unenforceable. Hernandez is "free to argue during arbitration that the confidentiality clause is unenforceable." *Kilgore*, 718 F.3d at 1059 n. 9.

#### (e) Settlement Restrictions

 In passing, Hernandez asserts that the "Rules prohibit the parties from settling their case after the arbitration hearing has been closed without the approval of the arbitrator." She contends this "acts as an obstacle to parties' resolving their dispute among themselves, in violation of public policy."[99] CarMax does

---

99. MTC Opposition at 13–14.

not respond to this argument in its reply. Rule 15 provides:

"The Parties *may settle their dispute at any time.* Prior to the closure of the arbitration hearing, the Parties may settle the case without involvement of the Arbitrator. Once the hearing has closed, settlement may take place only with the approval of the Arbitrator. At any point prior to the Arbitrator's issuance of an award, the Parties may, by agreement, refer their dispute to mediation before a mediator provided by the Arbitration Service." [100]

Although Hernandez does not clearly argue so, it appears she believes that the provision conditioning settlement on approval of the arbitrator after the arbitration hearing has concluded is unconscionable because the arbitrator, who is being paid to conduct the arbitration, may have an incentive to disapprove a settlement on which the parties mutually agree. Such a limitation on the parties' ability to resolve the dispute voluntarily could run contrary to the "strong public policy of this state ... encourag[ing] voluntary settlement of litigation." *Osumi v. Sutton,* 151 Cal. App.4th 1355, 1359, 60 Cal.Rptr.3d 693 (2007). Given the fact that California "courts will refuse to enforce arbitration provisions that are ... contrary to public policy" on grounds that they are unconscionable, *Abramson v. Juniper Networks, Inc.,* 115 Cal.App.4th 638, 651, 9 Cal. Rptr.3d 422 (2004) (citing *Armendariz,* 24 Cal.4th at 99, 99 Cal.Rptr.2d 745, 6 P.3d 669), the court concludes that the settlement provision exhibits some degree of substantive unconscionability.

The DRRP, however, gives the parties free rein to settle the case without the arbitrator's approval at all times after the filing of the arbitration demand through

conclusion of the hearing. Given this freedom, and the narrow set of circumstances under which the arbitrator's approval must be obtained, the settlement provision is, at most, minimally unconscionable.

### (f) Discovery Limitations

Hernandez next contends that the limitations on discovery set forth in the DRRP are substantively unconscionable.[101] As the Ninth Circuit and California Supreme Court have recognized, "adequate discovery ... does not mean unfettered discovery," and "an arbitration agreement [can] specify 'something less than the full panoply of discovery provided in [the California] Code of Civil Procedure." *Ferguson v. Countrywide Credit Industries, Inc.,* 298 F.3d 778, 787 (9th Cir.2002) (citing *Armendariz,* 24 Cal.4th at 106, 99 Cal. Rptr.2d 745, 6 P.3d 669). The court has already discussed the fact that the 2011 DRRP affords both Hernandez and CarMax "more than minimal discovery," and is not unconscionable in this regard. See *Herrera,* 2014 WL 3398363 at *8–9 ("The DRRP's Rule 8 provides for initial disclosure of relevant documents, production of the [ ] plaintiff's 'personnel records file,' up to twenty interrogatories which may be submitted with a request for supporting documents, and additional discovery on a showing of 'substantial need.' The court in *Sanchez* reviewed the DRRP's Rule 8 and found that it was not unconscionable.... Plaintiffs have not shown that the discovery allowable under the DRRP would be unconscionable in wage-and-hour cases. Because the DRRP allows for a significant amount of discovery, because California courts have found it sufficient, and because discovery in arbitration need not be as robust as provided for in a court's rules of procedure, the DRRP's

---

**100.** 2011 DRRP at 13.

**101.** MTC Opposition at 14.

Rule 8 is not unconscionable"); *Sanchez*, 224 Cal.App.4th at 404–06, 168 Cal.Rptr.3d 473 ("The DRRP provides for disclosure of relevant documents and production of the personnel file upon request, with each party under a continuing obligation to supplement its initial disclosure, and limits each party to 20 interrogatories and three depositions. The DRRP also provides that on request of any party and a showing of 'substantial need,' the arbitrator may allow additional discovery if it 'is not unduly burdensome and will not unduly delay the conclusion of the arbitration.' Sanchez argues that a plaintiff has a greater need for discovery and so the limitation, even if it applies to both him and CarMax, is unfair. . . . Sanchez has not made any showing how the limitation on discovery would prevent him from vindicating his rights in his particular case. Instead, he argues that granting the arbitrator the discretion to determine whether there is a 'substantial need' for additional discovery is not sufficient, because the 'substantial need' standard is too stringent.' . . . The discovery provisions in the CarMax DRRP are considerably more liberal [than those of the agreements at issue in *Fitz* ("compelling need") and *Ontiveros v. DHL Express (USA), Inc.*, 164 Cal.App.4th 494, 79 Cal. Rptr.3d 471 (2008) (substantial need but much less discovery of right than afforded by the CarMax agreement)]. . . . Further, . . . Sanchez does not make any showing that he could not maintain his claim without more discovery than provided by the agreement. Without some showing that Sanchez would be unable to vindicate his rights, we would not conclude that CarMax's DRRP discovery provisions are unconscionable as a matter of law," citing *Martinez v. Master Protection*

*Corp.*, 118 Cal.App.4th 107, 118–19, 12 Cal. Rptr.3d 663 (2004)).

### (g) Burden of Proof

Finally, Hernandez argues that the DRRP is substantively unconscionable because it "expressly place[s] the burden of proving a claim or claims by [a] preponderance of the evidence [on the employee]," and makes no "exception for those claims for which the employee does not bear the burden of proof." For this reason, she contends, the agreement "improperly shifts th[e] burden [of proof] to the employee" on all claims.[102] As with many of Hernandez's other contentions, she focuses on the 2001 DRRP, rather than the 2011 DRRP. Rule 9© of the 2011 DRRP provides:

> "For the Associate to prevail, the Associate must prove that the Company's conduct with respect to the Associate was a **violation of applicable law**. For the Company to prevail on any claims asserted against an Associate, the company must prove that the Associate's conduct was [a] **violation of applicable law**."[103]

Thus, far from "improperly shift[ing] th[e] burden" to Hernandez, the DRRP explicitly requires that she satisfy the same burden of proof she would be required to satisfy if proceeding in court. Hernandez cites no reason why the court should conclude that a bilateral requirement that both Hernandez and CarMax satisfy their respective burdens of proof under applicable law is unconscionable, and the court can discern none. Because the DRRP provides that Hernandez and CarMax have the burden of proving their respective claims just as they would in court, the 2011 DRRP does not unconscionably shift the burden of proof on all claims to Hernandez. See, e.g., *Sanchez*,

---

**102.** MTC Opposition at 14.

**103.** 2011 DRRP at 11 (emphasis original).

224 Cal.App.4th at 406, 168 Cal.Rptr.3d 473 ("[T]he DRRP[ ] require[s] that '[t]o prevail, an Associate must prove that the Company's conduct with respect to the Associate was a violation of applicable law.' ... [T]he requirement that to prevail in arbitration, the employee must demonstrate a violation of law, is hardly unconscionable on its face, and also applies 'with full force and effect' to CarMax should it initiate arbitration against the employee. These provisions are not unconscionable").

### (6) Severability of the Settlement Provision

▉ The arbitration agreement at issue has indicia of both procedural and substantive unconscionability: it is a contract of adhesion that the prospective employee must accept as a condition of employment and it might have the effect of preventing the parties from voluntarily resolving the case after the close of the arbitral hearing. Under Civil Code § 1670.5(a), a court may either refuse to enforce an agreement that is "permeated" by unconscionability, *Armendariz*, 24 Cal.4th at 122, 99 Cal.Rptr.2d 745, 6 P.3d 669, or, alternatively, "[i]f the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." *Id.* at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.

In *Armendariz*, the court discussed the severance of contractual provisions:

"Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract. Second, more generally, the doctrine of severance at-

tempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. The overarching inquiry is whether the interests of justice ... would be furthered by severance. Moreover, courts must have the capacity to cure the unlawful contract through severance or restriction of the offending clause...." *Armendariz*, 24 Cal.4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669 (citations and internal quotation marks omitted).

▉ Factors weighing against severance include (1) the existence of more than one unlawful provision in the arbitration agreement, and (2) the inability of the court to "remove the unconscionable taint from the agreement" by simply striking or limiting a provision. *Id.* at 124–25, 99 Cal.Rptr.2d 745, 6 P.3d 669. "The overarching inquiry is whether the interests of justice ... would be furthered by severance." *Id.*

Here, unlike in *Armendariz*, severance of the unconscionable provision is appropriate. Compare *id.* at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("In this case, two factors weigh against severance of the unlawful provisions. First, the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. In other words, given the multiple unlawful provisions, the trial court did not abuse its discretion in concluding that the arbitration agreement is permeated by an unlawful purpose"); *Dunham v. Environmental Chemmical Corp.*, No. C 06–03389 JSW, 2006 WL 2374703, *12–13 (N.D.Cal. Aug. 16, 2006) ("Having determined that the provision requiring only Dunham, but not ECC, to arbitrate, and the provision

requiring Dunham to exhaust ECC grievance procedures prior to initiating arbitration were substantively unconscionable, and that, as a contract of adhesion that failed to attach the relevant rules the Arbitration Agreement was procedurally unconscionable, the Court next turns to whether or not the Arbitration Agreement can be severed, or if the entire agreement must be invalidated.... [I]n the instant case, the one-sided duty to arbitrate is present. The one-sided duty to arbitrate, in conjunction with Dunham's duty to exhaust company grievance procedures, indicates that the agreement is 'tainted with illegality,' and that the illegality is not merely collateral to the agreement. Furthermore, it would be impossible for this Court to strike or restrict a single provision to avoid the contract's unconscionable result. Reformation of the Arbitration Agreement would be necessary. As noted in *Armendariz,* this Court does not have such power. Accordingly, this Court finds the entire Arbitration Agreement invalid, and thus declines to enforce it" (citations omitted)); see also *Ferguson,* 298 F.3d at 788 ("In the instant case, the lack of mutuality regarding the type of claims that must be arbitrated, the fee provision, and the discovery provision, so permeate Countrywide's arbitration agreement that we are unable to sever its offending provisions.... In *Mercuro,* the California Court of Appeal reached the same conclusion and declined to sever the objectionable provisions ... noting '[i]f we did so ..., we would need to rewrite those provisions according to what we believed was fair and equitable. This, of course, we cannot do.' For these same reasons, we find that Countrywide's arbitration agreement is so permeated with unconscionable clauses that we cannot remove the unconscionable taint from the agreement," citing *Mercuro,* 96 Cal.App.4th at 185, 116 Cal. Rptr.2d 671).

By contrast, CarMax's arbitration agreement contains a *single portion* of one provision that could arguably be said to be unconscionable. Unlike the provisions at issue in *Armendariz* and the cases cited above, the settlement provision is mutual and affects *both* parties' ability to settle the case equally. The restriction on their right to settle without the arbitrator's approval does not "permeate" the arbitration agreement as a whole, or even the provision in which it is found, and can be easily severed.

Consequently, the court concludes that severing the unconscionable portion of the settlement provision—i.e., the portion that requires the parties to obtain the arbitrator's approval of any settlement reached after the arbitral hearing has concluded—is appropriate. See *Martin v. Ricoh Americas Corp.,* No. C–08–4853 EMC, 2009 WL 1578716, *6 (N.D.Cal. June 4, 2009) ("In the instant case ... there is only one substantively unconscionable provision; the arbitration agreement otherwise comports with the requirements of *Armendariz* ( e.g., providing for a neutral arbitrator, more than minimal discovery, and all of the types of relief that would otherwise be available in court and not requiring an employee to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum).... Because there is only one substantively unconscionable provision easily capable of severance, and because there is no other indication that there has been 'a systematic effort [on the part of Ricoh] to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage,' the Court shall sever ¶ 8 and compel arbitration" (citation omitted)); *Siglain v. Trader Publishing Co.,* No. C 08–2108 JL, 2008 WL 3286974, *11 (N.D.Cal. Aug. 6,

2008) ("In this case, the Agreement in question is in no way 'permeated' with unconscionability. The only provision which is even arguably substantively unconscionable is that excluding claims concerning restrictive covenants. This provision is a far cry from the one in *Armendariz* which required only employees' claims to be arbitrated. In all other respects, this Agreement tracks the requirements of *Armendariz* and its progeny in terms of cost allocation, no limits on employees' remedies, permitting adequate discovery, providing for a neutral arbitrator, and in applying to both parties equally. Furthermore, unlike *Armendariz* and other cases, the one potentially unconscionable provision ... can easily be severed without requiring any rewriting of the Agreement.... For all the above reasons, Defendant's motion to stay this case pending arbitration is granted, and Plaintiff's motion to enjoin the arbitration and proceed in this case is denied" (citation omitted)); *Lucas v. Gund, Inc.*, 450 F.Supp.2d 1125, 1134 (C.D.Cal.2006) ("Just because the costs and fees provision and the New Jersey provision are unenforceable, however, does not mean that the arbitration agreement as a whole is substantively unconscionable and cannot be enforced.... Aside from the two provisions discussed above, nothing else in the agreement is patently unfair to the employee, and nothing suggests that the agreement was drafted with the purpose of depriving employees of the right to litigate their claims.... Once the two objectionable provisions have been severed, what the employee is left with is a perfectly fair and reasonable agreement to arbitrate. Accordingly, substantive unconscionability does not 'permeate' this agreement as it contains only two objectionable provisions which are easily severable. The Court orders the above two provisions severed

but finds that the remainder of the agreement is enforceable" (citation omitted)).

## III. CONCLUSION

For the reasons stated, the court denies Hernandez's motion to dismiss and grants CarMax's motion to compel arbitration. The court severs the arbitration agreement's provision requiring the parties to obtain the arbitrator's approval of a settlement reached after the close of the arbitration hearing. The court stays the state court action currently pending in Superior Court pending resolution of the arbitration in this matter. See, e.g., *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 399 (5th Cir. 2006) (affirming a district court's order compelling arbitration and staying a parallel state court proceedings); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1109 (9th Cir.2002) (affirming the district court's order compelling arbitration and staying state court proceedings); *Insurance Newsnet.com, Inc. v. Pardine*, No. 1:11–CV–00286, 2011 WL 3423081, *4 (M.D.Pa. Aug. 4, 2011) ("Plaintiffs also seek a stay of the New Jersey state court proceedings pending arbitration. In keeping with principles of federalism and respect for the sovereignty of the several states and their judicial system, the courts of the United States are generally prohibited by the Anti–Injunction Act from issuing injunctions to stay proceedings in state courts. However, the Anti–Injunction Act does empower the courts of the United States to enjoin actions in a state court where (1) an injunction is expressly authorized by Congress; (2) an injunction is necessary in aid of its jurisdiction; or (3) an injunction is necessary to protect or effectuate its judgments. The FAA does not expressly authorize federal courts to enjoin state court proceedings. However, such injunctions fall within the second exception to the Anti–Injunction Act because they are necessary in aid of federal juris-

diction. Allowing the New Jersey action to proceed 'would eviscerate the arbitration.process and make it a 'hollow formality,' with needless expense to all concerned.' Accordingly, the Court has the authority to stay the New Jersey action pending arbitration and will grant Plaintiffs' motion" (citations omitted)); *M.A. Mortenson/Meyne Co. v. Edward E. Gillen Co.*, No. Civ. 03–5135 PAM/RLE, 2003 WL 23024511, *4 (D.Minn. Dec. 17, 2003) ("[T]his Court has the authority to compel arbitration and stay the Illinois state court proceedings. Therefore, the Court will stay the Illinois state court proceedings and compel Gillen to arbitrate according to the terms of the Subcontract," citing *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 728 (8th Cir.2001); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 323 (7th Cir.1995); 9 U.S.C. § 4). Cf. *Terminix International Co., LP v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327, 1333 (11th Cir.2005) (reversing the district court's denial of Terminix's § 4 petition and ordering, on remand, that the district court issue an order granting the motion compelling arbitration and staying the underlying state court proceedings).